[No. A044280. First Dist., Div. Three. July 30, 1991.]

Adoption of MATTHEW B., a Minor.
NANCY B., Plaintiff and Appellant, v.
CHARLOTTE M., Defendant and Respondent.

[No. A045711. First Dist., Div. Three. July 30, 1991.]

TIMOTHY M., Plaintiff and Respondent, v.
NANCY B., Defendant and Appellant.

1248

## COUNSEL

Rita L. Swenor, under appointment by the Court of Appeal, for Plaintiff and Appellant and Defendant and Appellant.

Van Deusen, Youmans & Walmsley and Christian R. Van Deusen for Defendant and Respondent and for Plaintiff and Respondent.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Charlton G. Holland, Assistant Attorney General, Stephanie Wald and Angela Botelho, Deputy Attorneys General, for Minor.

## OPINION

**CHIN, J.**—In this first surrogate parenting case to reach a California appellate court, we begin to grapple with the conflicting human and public

policy concerns that surround the ongoing debate about surrogacy. The primary casualty of this conflict is a child caught in the cross fire between his birth mother, on the one side, and his father and adopting mother on the other. The best interests of this young child must be our paramount concern.

In 1984, appellant Nancy B. learned from a newspaper article that respondents Timothy and Charlotte M., who were unable to have a child of their own, were interested in a surrogate parenting arrangement. Nancy later agreed to be a surrogate mother for the M.'s.[1] On September 1, 1986, some nine months after being artificially inseminated with Timothy's sperm, Nancy gave birth to Matthew. Three days later, Nancy gave custody of Matthew to the M.'s, with whom he has lived ever since. Timothy obtained a stipulated judgment of paternity. Charlotte petitioned to adopt Matthew. In support of her petition, she filed a consent to adoption Nancy signed in November 1986. Almost eight months after signing the consent, Nancy petitioned to withdraw it. The trial court denied relief. Nancy then moved to vacate the judgment of paternity. The trial court again denied relief. In one appeal (action No. A044280), Nancy challenges the trial court's denial of her petition to withdraw consent. In the other (action No. A045711), she challenges the denial of her motion to vacate the judgment of paternity.

After careful consideration of the evidence, we affirm both rulings. In so doing, we do not attempt to resolve the debate over the desirability or validity of surrogate contracts. The facts of this case, i.e., Matthew's birth, his placement with the M.'s, and Nancy's execution of a consent to adopt, take us beyond the debate over the validity of surrogate contracts. We rely instead on those considerations mandated by statute, the best interests of the child.

### FACTUAL AND PROCEDURAL BACKGROUND

Nancy B. was first interested in surrogate parenting in 1984. She saw an article discussing a surrogate arrangement between the M.'s and another woman. Nancy contacted the Center for Reproductive Alternatives (the Center) about becoming a surrogate mother. Her application stated that she wanted to be a surrogate in order to have a positive birth experience without the responsibility of raising the child. Nancy also stated that she loved the feeling of being pregnant but had no desire to have another child, that she had strong feelings against becoming a single mother, and that she wanted very much to give the gift of a child to a couple that could not otherwise have children.

---

[1]We use only the first names of the parties, not out of disrespect, but to give them some limited measure of privacy, as well as for clarity and ease of reading.

Nancy first met the M.'s at the Center on April 2, 1985. They next met in May at the Center and together watched a lengthy videotape in which William Handel, an attorney specializing in surrogate contracts who was representing the M.'s, read and explained each provision of the proposed contract, including the legal aspects of surrogate parenting. Afterwards, Handel joined the meeting and answered questions about the contract. Since Handel required that independent counsel advise surrogates prior to their execution of an agreement, Nancy was told to see her own attorney before signing the contract.

Nancy subsequently met for three and one-half hours with Larry Levy, an attorney hired for Nancy by the Center and paid for by the M.'s. Nancy discussed the contract with Levy, including its potential illegality and unenforceability. Nancy signed the contract in Levy's office on June 17, 1985.

The contract designated Timothy as the "Natural Father" and Charlotte as the "Adopting Mother." In it, Nancy agreed to be artificially inseminated with Timothy's sperm "so that [Nancy] may bear a Child biologically related to [Timothy], to be . . . subsequently adopted by [Charlotte] as her child." The executed contract also included a number of additions Nancy requested. Finally, Nancy warranted in the contract that she had retained and consulted independent legal counsel and had been advised regarding the terms of the contract and its enforceability.

Nancy became pregnant in December 1985, and Matthew was born on September 1, 1986, at 11:54 p. m. On the birth certificate, Nancy designated Timothy as the father. Three days later, Nancy read and signed a "Health Facility Minor Release Report" (Release), which authorized the hospital to release Matthew to the M.'s. The Release recited that Nancy was releasing Matthew to the M.'s "for the purpose of Adoption Planning,"[2] and contemplated that the M.'s would file the adoption petition within 30 days, or the State of California Department of Social Services would make an investigation.

On September 23, 1986, Timothy filed a paternity action with a complaint and a stipulation to judgment Nancy had signed. The court entered judgment by stipulation on October 28, declared Timothy to be Matthew's father, and gave Timothy sole custody.

On September 25, within 30 days of Nancy's execution of the Release, Charlotte filed a petition for stepparent adoption. On November 13, Nancy

---

[2]The Release defined "Adoption Planning" as "all instances in which a child is released for purposes of eventual adoption, whether child leaves the hospital with his prospective adoptive parents or with adoption agency representative."

signed a consent to the adoption before a clerk at the Marin Civic Center. (Civ. Code, § 226.9.)[3] The signing was part of a surprise birthday party Nancy initiated and planned for Charlotte's 44th birthday. Nancy felt that the signing would be a nice birthday gift for Charlotte. The party involved an elaborate champagne picnic lunch on the lawn of the Marin Civic Center. Nancy gave the original of her signed consent to Charlotte as a birthday present.

The day of the picnic was Nancy's first contact with Matthew since she gave him to Charlotte at the hospital. After that visit, Nancy saw Matthew twice before Christmas and again in February when she dropped by the M.'s residence unannounced. She also saw him in March and June 1987.

The relationship between the M.'s and Nancy began to deteriorate in late February 1987 when, despite her agreement that publicity would be detrimental to Matthew, Nancy began appearing on television and in newspapers stating that she intended to sue for custody of Matthew and displaying pictures of Matthew and Charlotte without the M.'s consent. Nancy promised the M.'s she would stop appearing in the media, but she did not. As a result, the M.'s stopped trusting Nancy and decided that Matthew should have no further contact with her.

On July 2, 1987, Nancy filed a petition requesting that the court allow her to withdraw her consent to the stepparent adoption and grant her periods of custody.[4] After numerous continuances, the hearing commenced in April 1988. At the close of her case, Nancy moved orally and without notice to amend her petition under Code of Civil Procedure section 473, presumably to conform to proof, and to vacate the judgment of paternity. The court did not grant either motion. The hearing concluded in August 1988, and the court filed its tentative decision denying Nancy's petition on October 3. On Nancy's request, the court adopted the tentative decision as its statement of decision on November 7. The court entered judgment denying the petition on November 15. Nancy filed her notice of appeal from the judgment on November 28.[5]

---

[3]All further statutory references are to the Civil Code unless otherwise indicated.

[4]By contrast, on appeal, Nancy states that she "is not seeking physical custody of her son. She is seeking the visitation she was always promised." The trial court noted a similar confusion, stating: "There is some doubt as to the relief sought by [Nancy]. The prayer of the petition requests permission to withdraw consent and also custody of Matthew; however, [Nancy's] declaration filed herein . . . and part of her testimony indicates [sic] that she is seeking visitation rights. Other testimony of [Nancy] indicates that she seeks shared custody of Matthew."

[5]Section 226a makes an order withholding approval of a withdrawal of consent appealable the same as a juvenile court order declaring any person to be a ward of the court.

Having lost on her petition, on October 25, 1988, Nancy again moved to vacate the judgment of paternity entered two years before in October 1986. The court heard the motion December 6, 1988, and denied it on February 23, 1989. Nancy filed her notice of appeal from the order denying the motion to vacate on April 6, 1989. At Nancy's request, we consolidated the appeals on June 29, 1989.

### Discussion

### I. *Petition to Withdraw Consent to Stepparent Adoption*

Resolution of the appeal from the order denying Nancy's petition to withdraw consent turns on the application of section 226a. Section 226a provides that a natural parent's withdrawal of consent to adoption requires court approval and directs the court to withhold approval unless it "finds that withdrawal of the consent . . . is reasonable in view of all the circumstances, *and* that withdrawal of the consent will be for the best interests of the child . . . ." (Italics added.) If both conditions are not met, the court should deny the petition.

 Section 226a "vest[s] the trial court with considerable discretion in deciding whether to permit withdrawal of consent. [Citations.] This discretion is made necessary by the absence of a mechanical or talismanic solution by which section 226a contests may be resolved. The sum of intangibles which go into the statutory 'reasonable under the circumstances' and 'best interests' formula is in part comprised of the demeanor, attitudes, intonation, sincerity and personality of the witnesses as well as more exact concerns as to the relative fitness of the parties, educational . . . opportunities for the child, the emotional and love attachments the parties have for the child and the child's mental and physical health." (*Guardianship of Baby Boy M.* (1977) 66 Cal.App.3d 254, 267 [135 Cal.Rptr. 866], fn. omitted.) The weight assigned to each of these factors is within the exclusive province of the trial court. (*Id.,* at p. 276, fn. 18.)

 Accordingly, we may reverse the trial court's decision only for an abuse of discretion. (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704 [117 Cal.Rptr. 856, 84 A.L.R.3d 654].) Moreover, we apply the substantial evidence test in reviewing the trial court's factual determinations. (*Guardianship of Baby Boy M., supra,* 66 Cal.App.3d at p. 275.) It is the duty of the trier of fact to determine the credibility of witnesses and the value of evidence and to resolve any evidentiary conflicts. (*Ibid.*) Thus, so long as substantial evidence supports the trial court's findings, we must affirm. (*Id.,* at pp. 274-275.)

## A. *Reasonable Under the Circumstances*

Nancy argues that withdrawal of consent is reasonable under the circumstances for the following reasons: (1) the illegality of the contract is a sufficient basis for withdrawal; (2) the stepparent procedure was improper because of the paternity judgment's invalidity; (3) she did not know of her rights; and (4) the M.'s promised her visitation. We find these arguments are without merit.

### 1. *Alleged Illegality of Contract*

Nancy first argues that the alleged illegality of the surrogate contract by itself justifies withdrawal of consent, and complains that the trial court abused its discretion in refusing to reach the question of illegality. We disagree for the following reasons.[6]

First, as the trial court correctly concluded, Nancy's original petition raised no question of illegality. Other than alleging that Matthew's conception "was accomplished by means of artificial insemination by agreement of [Nancy], the natural father [Timothy] and the adopting parent [Charlotte]," the petition does not allege the existence of a surrogate contract. It does not, for example, allege that the M.'s paid money in exchange for Nancy's consent to the adoption, which is the basis for Nancy's claim of illegality. As Nancy properly concedes in her brief on appeal, "the [trial] court was correct that the invalidity of the surrogacy contract was not specifically framed by the prayer for relief in the original petition . . . ." She is not correct, however, in her assertion that the petition "did request that the consent be withdrawn on factual allegations which specifically raised issues relating to the validity of the contract." Thus, with respect to her claim of illegality, Nancy has failed to comply with section 226a's requirement that the petition set forth the reasons for withdrawal of consent.

Second, even had the petition adequately raised the issue, a finding of illegality would not assist Nancy under our traditional approach to illegal contracts. Courts generally will not assist parties who seek to obtain relief by showing they entered into an illegal transaction. (*Hooper* v. *Barranti* (1947) 81 Cal.App.2d 570, 576 [184 P.2d 688].) Here, it is Nancy who seeks to

---

[6]While the trial court did not resolve the illegality question, it clearly did consider *the circumstances* leading up to the signing of the consent, including the existence of the contract. Indeed, it overruled the M.'s objection on this point, finding such evidence relevant to the section 226a "reasonable in view of all the circumstances" inquiry. Thus, Nancy is incorrect in stating that the trial court eliminated the contract from its consideration. It eliminated only consideration of whether that contract was illegal, and we find properly so.

obtain relief, i.e., the withdrawal of her consent, because of illegality. By contrast, Charlotte's adoption action relies not on the allegedly illegal contract, but on Nancy's signed consent. The adoption action simply does not call upon the court to enforce an allegedly illegal contract. (See *Kassianov* v. *Raissis* (1962) 200 Cal.App.2d 573, 577 [19 Cal.Rptr. 614] [suit on alleged loan which does not call on court to enforce a life care contract does not present the issue of contract's illegality].)

■ Moreover, courts will not intercede where the parties have fully performed under the illegal contract. (See *Denning* v. *Taber* (1945) 70 Cal.App.2d 253, 258-259 [160 P.2d 900].) This rule "is intended to preserve the dignity of the law by refusing to determine controversies dependent upon the construction of illegal contracts. That rule is limited to the necessity of depending on the illegal contract to determine the issues. If that rule were not so limited, the courts would often be required to assume the impossible burden of determining just how serious or remote the taint may be." (*Id.*, at p. 259.) Since Nancy and the M.'s have fully performed the surrogate contract, it is unnecessary to determine its legality.

Furthermore, illegality would not be a proper basis for relief here because the parties assumed the risk of illegality in entering into the contract. ■ "Where parties are aware at the time the contract is entered into that a doubt exists in regard to a certain matter and contract on that assumption, the risk of the existence of the doubtful matter is assumed as an element of the bargain. [Citations.]" (*Guthrie* v. *Times-Mirror Co.* (1975) 51 Cal.App.3d 879, 885 [124 Cal.Rptr. 577].) ■ Here, the contract provides that (1) the parties' conduct under the contract might violate a number of sections of the California Penal and Civil Codes; (2) the parties understand the courts might declare the contract void as against public policy or hold it unenforceable; and (3) parental rights regarding children born pursuant to such contracts are unsettled. In addition, prior to executing the contract, Nancy discussed its potential illegality and unenforceability with Levy, her attorney. Thus, "the parties doubted the validity of the transaction and therefore assumed the risk that the contract might be found to be violative of the . . . laws." (*Id.*, at p. 886.)

Finally, even if Nancy were in a position to raise the issue, and even were we to find the contract illegal, we would not automatically void the consent. ■ The effect of illegality on a transaction depends on the facts and equities of the particular case (*Johnson* v. *Johnson* (1987) 192 Cal.App.3d 551, 558 [237 Cal.Rptr. 644]), including "the kind and degree of illegality involved, the public policy or policies to be served, whether those public policies will best be served by enforcing the agreement or denying enforcement and the relative culpability and equities of the parties." (*Homestead Supplies, Inc.* v. *Executive Life Ins. Co.* (1978) 81 Cal.App.3d

978, 989 [147 Cal.Rptr. 22].) Thus, were we to find the surrogate contract illegal, the appropriate remedy would depend upon a weighing of these factors.

Here, the state has a paramount interest in Matthew's welfare. (*Lucachevitch* v. *Lucachevitch* (1945) 69 Cal.App.2d 478, 484 [159 P.2d 688].) "It is the cardinal rule of adoption proceedings that the court consider what is for the best interests of the child. [Citation.]" (*Adoption of Laws* (1962) 201 Cal.App.2d 494, 498 [20 Cal.Rptr. 64].) We can never ignore the child's best interests, "no matter what preliminary action its parent or parents may have taken." (*In re Barents* (1950) 99 Cal.App.2d 748, 753 [222 P.2d 488].) Indeed, the child's welfare is "*the controlling force* in directing its custody, and the courts will always look to this rather than to the whims and caprices of the parties." (*Crater* v. *Crater* (1902) 135 Cal. 633, 634 [67 P. 1049].)

Accordingly, even if we assume that the parties' conduct was illegal, the state's paramount interest in Matthew's welfare overrides its interest in "deterring illegal conduct." (*Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 150 [308 P.2d 713].) To hold otherwise would, in violation of the above principles, allow the "preliminary action" of Matthew's parents (*In re Barents, supra*, 99 Cal.App.2d at p. 753) to determine his fate without due regard for his best interests. It is simply too late for Matthew to enjoy any of the alleged benefits that might accrue from deterring surrogacy arrangements, even were we to find that the state has an interest in doing so. "The reality is that [Matthew] is in being and of necessity must be reared by parents. . . . No other alternative, such as [granting the petition to withdraw consent] for the purpose of discouraging such procedures, is appropriate here." (*Matter of Adoption of Baby Girl L.J.* (1986) 132 Misc.2d 972 [505 N.Y.S.2d 813, 815].)

Our conclusion is consistent with the Supreme Court's direction that courts should not strictly construe adoption consent requirements in favor of the rights of the natural parent, but should liberally construe them so as to further the main purpose of the adoption statutes: promoting " '. . . the welfare of children, bereft of the benefits of the home and care of their real parents, by the legal recognition and regulation of the consummation of the closest conceivable counterpart of the relationship of parent and child.' [Citation.]" (*San Diego County Dept. of Pub. Welfare* v. *Superior Court* (1972) 7 Cal.3d 1, 15 [101 Cal.Rptr. 541, 496 P.2d 453].) Applying this rule, the Supreme Court in *Adoption of Barnett* (1960) 54 Cal.2d 370, 378 [6 Cal.Rptr. 562, 354 P.2d 18], refused to construe consent requirements so as to "deprive the court of power to order an adoption which . . . is for the best welfare of the child, and to which the natural parent in fact freely consented

. . . ," noting that its decision would "[preserve] the integrity of the family of [the adopting party] and her two adopted sons." (*Id.*, at pp. 378, 379.) ██ ■ ■ Here, a ruling that the surrogate contract's alleged illegality automatically vitiates the consent, regardless of whether it was otherwise freely given,[7] would deprive the court of power to order an adoption it found to be in Matthew's best interests, and would fail to preserve the integrity of the only family he has ever known. Following *Barnett*, we decline to adopt such a rule.

Our conclusion is also consistent with decisions refusing to subordinate the child's best interests to general rules of deterrence. For example, in *San Diego County Dept. of Pub. Welfare* v. *Superior Court, supra,* 7 Cal.3d at page 9, the Supreme Court refused to apply the general rule denying extraordinary relief to those coming to court with unclean hands, reasoning that "[i]n an adoption or guardianship proceeding, . . . the question of clean hands is largely subordinated to the court's primary concern which is to determine what is in the best interest of the child. [Citations.]" Thus, despite a claim that an adoption agency had induced the natural mother to relinquish her child to the agency and withhold consent to adoption, the court held that "[e]xtraordinary relief [could be] granted . . . in order that the child involved can be placed in a permanent and stable environment as soon as possible." (*Ibid.*)

Similarly, in *Adoption of Michelle T., supra,* 44 Cal.App.3d at page 704, this district held that the state Department of Health's failure to follow its own regulations in investigating adoption petitions was not determinative of whether the trial court abused its discretion in denying an adoption petition. Rather, the court held that "[t]he overriding concern in an adoption case is 'the best interest of the child.' [Citations.]" (*Ibid.*) Given this overriding concern for the child's best interests, we likewise cannot allow the surrogate contract's claimed illegality in this case to determine Nancy's petition to withdraw her consent.

Finally, we note that our treatment of the alleged illegality comports with the treatment of contracts between natural parents purporting to determine

---

[7]The mere existence of the contract does not establish that Nancy did not freely give her consent. As a matter of general contract law, parties cannot rescind a contract " '. . . when it appears that consent would have been given . . . notwithstanding the duress, menace, fraud, undue influence, or mistake relied upon.' . . ." (*Greenawalt* v. *Rogers* (1907) 151 Cal. 630, 635 [91 P. 526].) Thus, rescission is appropriate only where the outside influences are " '. . . of such nature, weight, and force that the court can say "without it the contract would not have been made." ' [Citations.]" (*Id.*, at pp. 635-636.) As will be shown, there is ample evidence that Nancy freely signed the consent, the contract notwithstanding. Her conduct from the outset was that of someone with every intention of signing the consent and completing the stepparent adoption.

custody and control over their children. In the latter context, the "right [of parents] to contract with each other as to the custody and control of their offspring and to stipulate away their respective parental rights [citation], . . . is subject to the control of the court in which the matter affecting the child is pending, and the court is not required to award the custody in conformity with such stipulation [citations]." (*In re Arkle* (1928) 93 Cal.App. 404, 409 [269 P. 689].) Thus, such contracts, while not void or illegal, are not binding on a court; rather, the best interests of the child control custody determinations, regardless of the parties' agreement. (*Stewart* v. *Stewart* (1955) 130 Cal.App.2d 186, 193 [278 P.2d 441].) We find that the same emphasis on the child's best interests is appropriate here.[8] Thus, it is unnecessary to determine whether or not the surrogate contract is illegal. ██ In either case, Matthew's best interests control.[9]

## 2. *Use of Stepparent Adoption Procedure*

 Nancy next contends that withdrawal of consent is reasonable because the stepparent adoption procedure is improper and unavailable under the facts of this case. She bases this contention on her argument that section 7005, subdivision (b), precludes Timothy from being Matthew's legal father and renders the paternity judgment void. We reject Nancy's claim for a number of reasons.

First, as with her illegality claim, Nancy's petition simply did not allege this ground as a basis for withdrawing consent. Quite the contrary, Nancy refers to Timothy throughout her petition as "the natural father." The absence of this claim from Nancy's petition explains the trial court's failure to address it in the statement of decision, and it is improper for her to raise it for the first time on appeal.

 Second, Nancy's argument amounts to an improper collateral attack on the paternity judgment.[10] With a single exception not applicable to

---

[8]That surrogate contracts may involve the payment of money does not distinguish them from agreements between natural parents that courts have examined. For example, in *Tiffany & Co.* v. *Spreckels* (1927) 202 Cal. 778, 790-791 [262 P. 742], the Supreme Court rejected the contention that a mother's agreement to renounce her claim to custody of her children in exchange for the father's agreement to accept responsibility for the payment of the mother's debt was invalid.

[9]Of course, had Nancy not executed the consent, and were this an action on the contract for specific performance, a much different analysis would apply. With a few statutory exceptions, a natural parent's consent is a jurisdictional prerequisite to an adoption, regardless of the child's best interests. (See *Matter of Cozza* (1912) 163 Cal. 514, 523 [126 P. 161], disapproved on another ground in *Adoption of Barnett, supra*, 54 Cal.2d at p. 378.)

[10]Indeed, the trial court noted this fact in refusing to allow the filing of Nancy's amended petition which, among other things, sought to attack the paternity judgment on a variety of grounds.

this case, section 7010, subdivision (a), provides that "[t]he judgment or order of the court determining the existence or nonexistence of the parent and child relationship is determinative for all purposes . . . ." Thus, principles of collateral estoppel prohibit Nancy from challenging the paternity judgment in her petition to withdraw consent. (*County of San Diego* v. *Hotz* (1985) 168 Cal.App.3d 605, 608 [214 Cal.Rptr. 658]; *Adoption of Bonner* (1968) 260 Cal.App.2d 17, 20 [66 Cal.Rptr. 812].)

Finally, in part II of this opinion, we reject Nancy's attack on the paternity judgment. Therefore, we reject her challenge to the order denying her petition to withdraw consent to the extent it depends on her challenge to the paternity judgment.

### 3. *Knowledge of Her Rights*

Nancy's third contention is that she did not know her rights and that she had no independent legal counsel to inform her of her rights.

Substantial evidence supports the trial court's rejection of this argument. The stepparent adoption consent Nancy executed itself demonstrates her knowledge of the consequences of signing. (See *Adoption of Pitcher* (1951) 103 Cal.App.2d 859, 863-864 [230 P.2d 449] [substantial evidence supports finding that mother knew she needed court approval to withdraw consent, given document informed her of requirement].) In it, Nancy gave her "full and free consent" to Charlotte's adoption of Matthew and acknowledged that the court's execution of the adoption order would deprive her of all custody rights. The form also warned that Nancy could withdraw her consent only with court approval.[11] Nancy testified that she read the consent, understood that it was for a stepparent adoption, and particularly noted the warning that she could withdraw consent only with court approval.

Nancy's conduct further reflects that she fully understood what she was doing. During a surprise birthday party she initiated and planned, Nancy signed the consent as a birthday present to Charlotte. In preparation for the party, Nancy contacted the Marin County Clerk's office to determine the correct consent procedure. At the time of the signing, Nancy stated that she knew she could sign the consent at the probation department, but preferred to sign in the clerk's office. This statement is consistent with the transmittal letter Nancy received with the consent form, which pointed out the witnessing requirement, explained that she could sign "in front of a clerk down at

---

[11]The Release Nancy signed contained a similar warning.

the Superior courthouse *or* a social worker from the Department of Adoptions . . ." (italics added), and invited her to call if she had any questions.

Finally, Nancy's statements prior to signing demonstrate her knowledge of the consent's significance. In a July 1986 letter to the M.'s, Nancy wrote: "When I sign the legal paper work, then [the baby] will be completly [*sic*] yours." Shortly before signing the consent, Nancy stated both in a conversation with a coworker and in a letter that she intended to sign the stepparent adoption papers as a birthday present to Charlotte, and had arranged a surprise party so Charlotte could be at her side for the signing. Given this record, the trial court's ruling was not in error.

As to her claim regarding lack of independent counsel, the evidence shows that Nancy had an attorney-client relationship with Larry Levy and that he acted independently on her behalf. Nancy reviewed the surrogate agreement with Levy in a three-and-one-half-hour meeting, which resulted in numerous additions to the contract at Nancy's behest. Nancy continued to contact Levy for assistance at least through March 1986, when he successfully represented her in resolving certain financial problems relating to the surrogate contract. Finally, observing the attorney-client privilege and his duty of confidentiality, Levy was reluctant to talk to Timothy. Thus, the record refutes Nancy's claim regarding Levy's independence.[12] Indeed, Nancy warranted in the surrogate contract that she had consulted with independent counsel.

Aside from Levy, Nancy testified that she has contacted counsel when she thought counsel would be of assistance, and that she simply did not attempt to contact anyone prior to signing the consent. Consistent with her testimony, Nancy wrote in July 1986 that another attorney was representing her. Prior to signing the consent, Nancy consulted with this attorney regarding a possible malpractice suit against the Center as a result of treatment to facilitate her pregnancy. Despite this ongoing representation, Nancy did not ask the attorney about the consent until January 1987. On this record, we conclude that the trial court did not err in rejecting Nancy's claim regarding independent counsel.

The bulk of Nancy's argument views the evidence in a light most favorable to her. However, we must view the evidence in the light most favorable

[12]Nancy's reliance on the M.'s payment of Levy's fees is simply evidence that arguably supports a contrary inference. It is insufficient to *require* a contrary finding, especially given that the surrogate contract contemplated that the M.'s would reimburse Nancy for attorney fees. (See *Petition of Steve B.D.* (1986) 111 Idaho 285 [723 P.2d 829, 836].) We also note that, by statute, a court may require adopting parents to pay attorney fees for the birth parents' independent counsel. (§ 224.10, subds. (b)(1), (d).)

to the M.'s, giving them "the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citation.]" (*Jermstad* v. *McNelis* (1989) 210 Cal.App.3d 528, 552-553 [258 Cal.Rptr. 519].) We cannot second-guess the trial court's finding that Nancy's testimony regarding her understanding of her rights was not credible. (See *Guardianship of Baby Boy M., supra*, 66 Cal.App.3d at p. 275.)

#### 4. *Promise of Visitation*

Finally, Nancy attacks the trial court's finding that there was insufficient evidence of a false promise by the M.'s of visitation with Matthew and that, in any event, Nancy did not substantially rely on any promise of contact at or before the time she signed the consent.

 However, ample evidence supports the trial court's determination. To begin with, Nancy warranted in the surrogate contract that she did "not desire to have a parental relationship with the child born pursuant to this Agreement . . . ." She further agreed that she would not "attempt to form a parent-child relationship" or "attempt to contact" the child. Finally, Nancy warranted that she would "not seek to view the infant Child after the child leaves the hospital . . . ." This last provision was a modification, at Nancy's request, of one that originally required that she not seek to view the child after delivery. Nancy also added a provision requiring the M.'s to supply her with a picture every year. Nancy's written modifications cast doubt on her claim that there was an unwritten modification regarding visitation contrary to the written modifications. Also casting doubt on Nancy's claim are a provision requiring that any amendments be by a signed written agreement and a statement that the contract sets forth the parties' entire agreement.

Aside from the contract itself, Nancy's conduct refutes her claim that the M.'s promised visitation. Nancy told the press that she "hoped" to keep in contact with Matthew, but that any contact was left up to the M.'s discretion. She echoed these statements in an October 1986 letter stating that she "hope[d] Tim & Charlotte keep in touch with me." Nancy also repeatedly assured the M.'s throughout the pregnancy that she had no intention of keeping Matthew no matter what happened and that Matthew would be the M.'s child for the rest of their lives. In one of her letters setting forth this assurance, Nancy stated that "Tim and Charlotte will have this child for the rest of its life[,] [b]ut I need to be part of its mothering while in the hospital," and asked the M.'s for an "opportunity to visit and hold the baby while still in the hospital" and "for my family and friends to say hello and good-bye to this baby." In a July 1986 letter, Nancy wrote that (1) as birth mother, she knew she would be forgotten someday, (2) she "hope[d] and

pray[ed] that there is someone who'll be able to tell [the baby] the trueth [*sic*] . . . about Its birth mother Nancy" when "somewhere down the line [the] baby [grows] up and . . . ask[s] someone questions about me," and (3) "as far as I'm concerned Tim & Nancy's baby died on July 19 and any dreams, fantasys [*sic*], or hopes I had of ever knowing this child died along with It." By contrast, none of Nancy's other letters prior to February 1987 referred to a promise of visitation, and Nancy did not mention any such promise to the woman she chose as a communications bridge with Charlotte. Thus, Nancy's conduct, both in terms of what she said and what she did not say, is inconsistent with her alleged expectation of ongoing contact or visitation.

Finally, the M.'s testified that there was no promise of contact other than that they would send Nancy a picture and a letter every year. Charlotte further testified that Nancy did not express interest in seeing Matthew for six months after his birth. Indeed, in setting up a luncheon in early November, shortly before she signed the consent, Nancy expressly stated that she did not want Charlotte to bring Matthew.

In light of this evidence, the trial court did not err in disbelieving Nancy's claim that there was an agreement of visitation and that she signed the consent in order to see Matthew. Nancy's ability to point to evidence that might support a contrary determination does not allow us to set aside the trial court's decision.

## B. *Best Interests of the Child*

The "best interests" standard is "an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult." (*Adoption of Michelle T., supra*, 44 Cal.App.3d at p. 704.) "The best interest of the child is in being raised by the best parent. But that is not a matter that can be ascertained by crude calculation." (*Jermstad* v. *McNelis, supra*, 210 Cal.App.3d at p. 553.) Accordingly, we will reverse the trial court's determination of this issue only for a clear abuse of discretion. (*Taber* v. *Taber* (1930) 209 Cal. 755, 757 [290 P. 36].)

Section 226a sets forth a number of factors for the court to consider in determining the child's best interests. It directs that "[c]onsideration of the best interests of the child shall include, but not be limited to, an assessment of the child's age, the extent of bonding with the prospective adoptive parent or parents, the extent of bonding or the potential to bond with the natural parent or parents, and the ability of the natural parent or parents to provide adequate and proper care and guidance to the child."

Courts must weigh these factors and determine the child's best interests solely from the standpoint of the child, and should not consider the feelings and desires of the contesting parties, except insofar as they affect the child's best interests. (*Taber* v. *Taber, supra*, 209 Cal. at p. 757.) Moreover, where, as here, there is a signed consent to adoption, the natural parent does not enjoy the parental preference otherwise applicable in custody disputes under section 4600. (*Adoption of Jennie L.* (1980) 111 Cal.App.3d 422, 429 [168 Cal.Rptr. 695].) Therefore, a court may not grant relief under section 226a simply because it finds that withdrawal of consent would not be detrimental; rather, it must affirmatively find that withdrawal would serve the child's best interests. (*Id.*, at p. 428.)

Finally, the "best interests" standard is a relative one. "The question is not whether a particular set of circumstances is in the best interest of the child, but whether a particular set of circumstances relative to an alternative set of circumstances is in the best interest of the child." (*Adoption of Michelle T., supra*, 44 Cal.App.3d at p. 707.) Here, the alternatives are for Charlotte to adopt Matthew as his mother, or to have Nancy remain Matthew's legal mother with visitation rights and the ability to seek custody if she so chooses.

After finding both parties capable of providing for Matthew's health, safety, and welfare, and no difference in terms of the opportunities for education, the trial court determined that approval of Nancy's petition would not be in Matthew's best interests based on a relative assessment of the parties' bonding to Matthew and their fitness as parents. As shown below, the trial court's determination was not an abuse of discretion.

### 1. *Matthew's Bonding and Need for Stability*

A best-interests determination depends "upon a true assessment of the emotional bonds between parent and child, upon an inquiry into 'the heart of the parent-child relationship . . . the ethical, emotional, and intellectual guidance the parent gives to the child throughout his formative years, and often beyond.' [Citation.] It must reflect also a factual determination of how best to provide continuity of attention, nurturing, and care." (*Burchard* v. *Garay* (1986) 42 Cal.3d 531, 540 [229 Cal.Rptr. 800, 724 P.2d 486, 62 A.L.R.4th 237].) Thus, crucial to a best-interests determination is "the importance of stability and continuity in the life of a child, and the harm that may result from disruption of established patterns of care and emotional bonds." (*Id.*, at p. 541.) Indeed, "[s]tability, continuity, and a loving relationship *are the most important criteria* for determining the best interests of the child." (*Id.*, at p. 542 (conc. opn. of Bird, C. J.), italics added.) Amplifying these judicial pronouncements in this case is the

testimony of Nancy's expert, Dr. Kenneth Waldron, that at the time of the hearing Matthew was at the most critical age in terms of his need for stability and continuity.

To determine Matthew's best interests, Nancy and the M.'s jointly chose Dr. Frederica Conrad to prepare psychological evaluations of the parties. Based on personal observation and interviews, Dr. Conrad found that Matthew had formed a meaningful and healthy attachment with the M.'s. On the other hand, she found no psychological bond between Matthew and Nancy, and therefore no need for Matthew to have physical contact with Nancy. Given these findings, Dr. Conrad opined that contact or visitation with Nancy would disrupt Matthew's bond with the M.'s. As a result of this disruption, Matthew might become fragmented, depressed, and insecure in his attachments to the M.'s. Given the damage that contact would have on Matthew's already well-developed attachment to the M.'s, his psychological parents, Dr. Conrad was of the opinion that it would not be in Matthew's best interests to have periods of visitation with Nancy. Rather, Dr. Conrad concluded that adoption by Charlotte would best serve Matthew's interests. Representatives of both the Sonoma County Probation Department and State of California Department of Social Services similarly concluded that denial of the petition to withdraw consent was in Matthew's best interests. On this record, we cannot say the trial court's determination was an abuse of discretion.[13]

## 2. *Fitness as Parents*

The trial court gave more weight to Dr. Conrad's testimony than Dr. Waldron's regarding the parties' personalities. While Dr. Conrad found nothing to implicate the M.'s fitness as parents, her testing revealed evidence that Nancy had a personality disorder in the form of a paranoid type

---

[13]Nancy complains that the M.'s illegally prevented her from bonding with Matthew by frustrating her right to visitation. However, the facts show that, by signing the Release and the adoption consent and stipulating to paternity, Nancy released Matthew to the M.'s custody and intended that they act toward and bond with him as his mother and father. She can hardly complain that they have done so. Moreover, given our rejection of Nancy's claim that the M.'s agreed to visitation, we also reject her claim that the M.'s improperly prevented her from having contact with Matthew.

Nancy also challenges the trial court's reliance on her delay in filing the petition, arguing that an inability to obtain counsel excused the delay. The record does not support Nancy's assertion. In a February 1987 letter to the probation department, Nancy stated that " '[t]wo hours after I signed the Stepparent Adoption form, I found out [the M.'s] were reneging and would not follow through on our verbal agreement.' " She further urged the department to put a hold on the adoption proceedings because the surrogate contract was invalid, stating that her " 'attorney . . . and the couple's attorney . . . are in litigation now over the validity and the fact I was misrepresented.' "

character structure. Dr. Conrad classified this disorder as a serious psychological problem which might create difficulties for Nancy in communicating with and separating herself from a child. Dr. Conrad confirmed her opinions through another doctor's independent review of the data. The trial court also noted that the testimony of Nancy's former neighbors, while contradicted by other evidence, created further doubt as to Nancy's parenting ability.

This evidence adequately supports the trial court's determination regarding the relative fitness of the parties as parents. We simply cannot second-guess the trial court's weighing of that evidence. Indeed, we note that even Dr. Waldron did not disagree with Dr. Conrad's diagnostic impression; he simply had not reviewed enough information to support it. He also testified that Dr. Conrad's evaluation was thorough and that, with a couple of exceptions, her testing was accurately administered and interpreted. Moreover, while admitting that actual observation is essential in any psychological evaluation, Dr. Waldron testified that he never interviewed Nancy, the M.'s, or Matthew. Thus, the trial court did not abuse its discretion in giving more weight to Dr. Conrad's opinion than Dr. Waldron's, or in finding that withdrawal of consent would not be in Matthew's best interests.

## C. *Denial of Motion to Amend*

 We review the trial court's denial of Nancy's motion to amend for abuse of discretion. (*Hunt* v. *Smyth* (1972) 25 Cal.App.3d 807, 828 [101 Cal.Rptr. 4].) We find no abuse of discretion for two reasons. First, as the trial court noted, Nancy gave no notice of her motion either to the court or to respondents. In *Hall* v. *Department of Adoptions* (1975) 47 Cal.App.3d 898, 904 [121 Cal.Rptr. 223], the court held that it was error to allow the plaintiff orally to amend her pleading to state a new ground for setting aside a relinquishment for adoption, because plaintiff failed to give notice. In light of Nancy's failure to give notice, we cannot find that the trial court abused its discretion in denying her motion. Second, Nancy made her motion more than one year after she filed the original petition, on the ninth day of the hearing, after she had rested. Yet, as the trial court found, she provided no justification for this delay.[14] Given these facts, the trial court's

---

[14]On appeal, Nancy argues that a change in her counsel explains the delay. However, she did not offer this excuse to the trial court, and therefore it cannot serve as a basis for finding that the trial court abused its discretion. Moreover, we find this excuse inadequate in any event, given that (1) Nancy told the probation department in early 1987 that her attorney was contesting the validity of the contract, (2) Nancy's new counsel filed a writ petition *prior* to trial that was very similar to the amendment she later requested, and (3) Nancy made her motion when the trial reconvened after a two-month recess during which she could have made a properly noticed motion.

ruling was not an abuse of discretion. (See *Bedolla* v. *Logan & Frazer* (1975) 52 Cal.App.3d 118, 135-136 [125 Cal.Rptr. 59]; *Hunt, supra*, at p. 829.)[15]

## II. *Motion to Vacate Paternity Judgment*

Initially, we must determine whether the trial court's order denying Nancy's motion to vacate is appealable. (See *County of Ventura* v. *Tillett* (1982) 133 Cal.App.3d 105, 109 [183 Cal.Rptr. 741] [appellate court must dismiss appeal on own motion if it determines order not appealable], disapproved on another ground in *County of Los Angeles* v. *Soto* (1984) 35 Cal.3d 483, 492, fn. 4 [198 Cal.Rptr. 779, 674 P.2d 750].) ██ Ordinarily, an order denying a nonstatutory motion to vacate such as Nancy's is not appealable. (*County of Ventura, supra*, at p. 110.) However, courts have fashioned an exception "when an appellant attacks an order on the ground that it gives effect to a judgment that is void for lack of jurisdiction . . . ." (*Id.*, at pp. 110-111.) Such an order is "appealable as a final order after judgment [citation] if the underlying judgment was appealable. [Citations.]" (*John Siebel Associates* v. *Keele* (1986) 188 Cal.App.3d 560, 564, fn. 3 [233 Cal.Rptr. 231].) Therefore, the extent to which Nancy may appeal the denial of the motion to vacate the paternity judgment depends on the extent to which the stipulated judgment of paternity is appealable.

██ Ordinarily, a judgment entered pursuant to a stipulation is not appealable. (*Atchison, T. & S. F. Ry. Co.* v. *Hildebrand* (1965) 238 Cal.App.2d 859, 861 [48 Cal.Rptr. 339].) "It has been suggested, though never decided, in this state . . . that the rule requiring dismissal of appeals from consent judgments is subject to two exceptions, the first being in cases where the lower court did not have jurisdiction of the subject matter of the action, and the second in cases where the complaint is fatally defective [citation]." (*Reed* v. *Murphy* (1925) 196 Cal. 395, 399 [238 P. 78].) In rejecting such an attack, the Supreme Court in *Reed* "assume[d] for the purposes [of appeal] that a decree or judgment which is void upon its face is open to attack by anyone, including the parties thereto, even though they consented to its rendition."[16] (*Id.*, at pp. 399-400;

---

[15]Because these two factors warrant the trial court's ruling, we need not address the court's other reasons for denying leave to amend.

[16]A stipulated judgment also has been held appealable to the extent it exceeds the stipulation. (*Reed* v. *Murphy, supra*, 196 Cal. at p. 399.) Although Nancy unsuccessfully argued below that the judgment exceeded the terms of her stipulation, and her notice of appeal states this as a ground for appeal, Nancy has omitted the issue from her briefs on appeal. Accordingly, we deem her to have abandoned it. (*MacDonald* v. *Joslyn* (1969) 275 Cal.App.2d 282, 285 [79 Cal.Rptr. 707, 35 A.L.R.3d 641].) Nancy's mention of the issue in the supplemental brief she submitted upon our request for further briefing regarding appealability does not put the issue before us.

see also *John Siebel Associates* v. *Keele, supra,* 188 Cal.App.3d at p. 564, fn. 3 ["the fact that a judgment is entered pursuant to stipulation does not insulate the judgment from attack on the ground that it is void"]; *Robertson* v. *Maroevich* (1941) 42 Cal.App.2d 610, 613 [109 P.2d 708] [assuming party can appeal stipulated judgment for lack of subject matter jurisdiction].)

Making the same assumption, we find that the paternity judgment was not void. Nancy argues that the trial court acted in excess of its jurisdiction, and the paternity judgment is therefore void, because section 7005, subdivision (b),[17] prohibited Timothy from bringing the paternity action. However, Nancy's argument confuses errors that exceed a trial court's jurisdiction with errors of substantive law that are within its jurisdiction. Jurisdiction is the power to hear and determine a matter and is not at all dependent upon the judge's ability to reason correctly or to act incorruptibly. (*Estate of Gardiner* (1941) 45 Cal.App.2d 559, 562-563 [114 P.2d 643].) While parties may collaterally attack[18] judgments for lack of personal or subject matter jurisdiction or for granting relief that the court had no power to grant, they may not collaterally attack nonjurisdictional errors. (*Armstrong* v. *Armstrong* (1976) 15 Cal.3d 942, 950 [126 Cal.Rptr. 805, 544 P.2d 941].) Therefore, absent reversal on appeal, a judgment is valid and conclusive, even if contrary to statute, so long as the court had jurisdiction over the parties and power under the Constitution to deal with the subject matter. (See *Estate of Gardiner, supra,* at pp. 562-563.)

Here, the error Nancy asserts, properly understood, is not that the court acted in excess of jurisdiction, but that it erred under section 7005, subdivision (b), in finding that Timothy is Matthew's father. This alleged error, however, "does not reach the *power* of the court to act, but concerns instead a mistaken application of law." (*Armstrong* v. *Armstrong, supra,* 15 Cal.3d at pp. 950-951, original italics.) That the trial court may have wrongly decided the matter does not defeat or limit its jurisdiction or affect the validity or the finality of its judgment. (See *Estate of Gardiner, supra,* 45 Cal.App.2d at p. 563.) Thus, the alleged error under section 7005, subdivision (b), would not void the judgment because the trial court had both

---

[17]Section 7005, subdivision (b), provides that "[t]he donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived."

[18]Nancy's motion to vacate, brought after the six-month time limit of Code of Civil Procedure section 473, constitutes a collateral attack on the paternity judgment governed by rules relating to collateral attack. (*Becker* v. *S.P.V. Construction Co.* (1980) 27 Cal.3d 489, 492-493 [165 Cal.Rptr. 825, 612 P.2d 915]; *National Diversified Services, Inc.* v. *Bernstein* (1985) 168 Cal.App.3d 410, 416 [214 Cal.Rptr. 113].)

subject matter and personal jurisdiction.[19] (See *Wells Fargo & Co.* v. *City etc. of S. F.* (1944) 25 Cal.2d 37, 44 [152 P.2d 625]; *People* v. *Cotton Belt Ins. Co.* (1983) 143 Cal.App.3d 805, 808 [192 Cal.Rptr. 210] [errors within jurisdiction may not be raised to set aside judgment].)

■ Moreover, even were we to assume that the entry of judgment was an act in excess of the trial court's jurisdiction, Nancy's execution of the stipulation estops her from urging this point on appeal.[20] Where a court has subject matter jurisdiction, a party's request for or consent to action beyond the court's statutory power may estop the party from complaining that the court's action exceeds its jurisdiction. (*In re Griffin, supra,* 67 Cal.2d at p. 347.) Whether estoppel applies "depends on the importance of the irregularity not only to the parties but to the functioning of the courts and in some instances on other considerations of public policy." (*Id.,* at p. 348.) Given Nancy's stipulation to a judgment establishing Timothy's paternity and her designation of Timothy as Matthew's natural father in numerous documents, including the birth certificate and the petition to withdraw consent, to entertain her attack on the paternity judgment would impermissibly permit her " '. . . to trifle with the courts.' [Citation.]" (*Ibid.*) It would also contravene the public policy favoring the finality of paternity judgments, as expressed in section 7010, subdivision (a), the policy in favor of speedy determinations of paternity, and the policy that "abhors bastardy proceedings . . . ."[21] (*De Weese* v. *Unick* (1980) 102 Cal.App.3d 100, 106-107 [162 Cal.Rptr. 259].)

■ Nancy further argues that the trial court had no jurisdiction because section 7005, subdivision (b), not only prohibits a judgment of paternity in Timothy's favor, but it prohibits him from even bringing a paternity action. Assuming, without deciding, that lack of standing may be a basis for collateral attack,[22] we need look no further than section 7006 to find that

---

[19]The trial court had subject matter jurisdiction to determine paternity under section 7007. As we hold herein, it also had personal jurisdiction.

[20]The rule that waiver, consent, or estoppel cannot confer jurisdiction applies only to a trial court's lack of subject matter jurisdiction, not to acts in excess of that jurisdiction. (*In re Griffin* (1967) 67 Cal.2d 343, 346-347 [62 Cal.Rptr. 1, 431 P.2d 625]; *In re Christian J.* (1984) 155 Cal.App.3d 276, 279 [202 Cal.Rptr. 54].)

[21]That application of estoppel in this case serves public policy and Matthew's best interests distinguishes it from *In re Marriage of Goodarzirad* (1986) 185 Cal.App.3d 1020, 1026-1027 [230 Cal.Rptr. 203], where the court determined that it was not in the child's best interests to estop his father from attacking a stipulation that divested the trial court of jurisdiction to determine custody.

[22]Compare *Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 438-439 [261 Cal.Rptr. 574, 777 P.2d 610] (contentions based on lack of standing involve jurisdictional issues and may be raised at any time) with *Riego* v. *Foster* (1899) 125 Cal. 178, 181 [57 P. 896] (lack of creditor status may not serve as basis for collateral attack); *In re Pia's Estate* (1959) 121 Misc.2d 464 [189 N.Y.S.2d 508, 512] ("[a] decree based upon the petition of a

Nancy is incorrect. Subdivision (b) of section 7006 authorizes "*[a]ny inter-ested party* [to] bring an action at any time for the purpose of determining the existence or nonexistence of the father and child relationship presumed under paragraph (4) of subdivision (a) of Section 7004." (Italics added.) This section clearly authorizes Timothy, as an interested party, to bring an action to establish paternity.

Moreover, assuming that Nancy is correct in arguing that section 7005, subdivision (b), prohibits Timothy from being a presumed father under section 7004, section 7006, subdivision (c), would authorize him to bring a paternity action. That section authorizes "a man alleged or alleging himself to be the father" of "a child who has no presumed father under Section 7004" to bring "[a]n action to determine the existence of the father and child relationship" with respect to that child. Timothy clearly alleges himself to be Matthew's father. In addition, by stipulating to Timothy's paternity in nu-merous documents, including Matthew's birth certificate, Nancy has alleged that Timothy is Matthew's father. Therefore, Timothy's action would be proper under this subdivision.[23] Accordingly, section 7006 gives Timothy standing to file a paternity action regardless of whether section 7005, subdivision (b), ultimately prohibits a finding of paternity.

■■■■ Finally, Nancy argues that the paternity judgment is void for lack of personal jurisdiction because Timothy did not serve her with summons and complaint. We reject this argument for a number of reasons. First, Nancy's execution of the stipulation for entry of judgment and the stipula-tion to establish or modify child or family support and order constitutes a general appearance waiving any objection to a failure to serve summons. (See *Title Guarantee and Trust Co.* v. *Griset* (1922) 189 Cal. 382, 390 [208 P. 673]; *Cooper* v. *Gordon* (1899) 125 Cal. 296, 301 [57 P. 1006].) That Nancy executed the stipulation before Timothy filed the action does not change our conclusion. (See *Estate Of Raynor* (1958) 165 Cal.App.2d 715, 721 [332

---

party who had no right or legal capacity to institute a proceeding would be at most an irregularity that would not render the decree void and open to collateral attack"); and 2 Witkin, Cal. Procedure (3d ed. 1985) Jurisdiction, section 222, page 613 (lack of authority to sue is not jurisdictional error).

[23]We also note that, were Nancy to claim that someone else was Matthew's presumed father, subdivision (d) of section 7006 would give Timothy standing to file a paternity action. That subdivision authorizes "a man not a presumed father [to] bring an action for the purpose of declaring that he is the natural father of a child having a presumed father under Section 7004, if the mother relinquishes for, consents to, or proposes to relinquish for or consent to, the adoption of the child. . . ." Prior to the filing of the paternity action, Nancy proposed to consent to Matthew's adoption. The Release she signed at the hospital specifies that Nancy was releasing Matthew for the purpose of adoption planning.

P.2d 416] [rejecting contention that "the signing of the appearance and waiver before the divorce action was commenced is alone sufficient to render it ineffective"].)

Although Nancy claims that she did not understand that Timothy would use the stipulations she signed for court purposes, the trial court expressly ruled to the contrary, finding that she "was fully informed of the purpose of the paternity action and of the stipulation which she signed," that she was not "deceived or coerced . . . in signing the stipulation for entry of judgment," and that she "had the benefit of independent counsel." Substantial evidence—including an August 1986 letter to Nancy transmitting "documents regarding the paternity action" and a letter from Nancy in September 1986 referring to her execution of "the paternity papers"—supports the trial court's findings in this regard.

Second, even if Nancy's execution of two stipulations did not confer personal jurisdiction, Nancy's conduct estops her from relying on this ground. ■ Estoppel applies to prevent defendants who induce plaintiffs either to delay or overlook errors in service from taking advantage of the deception. (*Tresway Aero, Inc.* v. *Superior Court* (1971) 5 Cal.3d 431, 439-440 [96 Cal.Rptr. 571, 487 P.2d 1211].) ■ Here, the trial court found that Nancy knowingly executed two stipulations in the paternity action with the intention that Timothy's paternity would be established. In reliance on Nancy's actions, Timothy filed the stipulations and obtained a judgment. These actions estop Nancy from claiming that the court lacked personal jurisdiction.

Third, in addressing the merits of the paternity claim in her motion to vacate, Nancy made a general appearance that established personal jurisdiction. (See *Kallman* v. *Henderson* (1965) 234 Cal.App.2d 91, 98-99 [44 Cal.Rptr. 108] [general appearance made where defendant filed motion to set aside default based not only on lack of personal jurisdiction but also on subject matter of complaint and existence of fraud].) ■ Defendants asserting lack of personal jurisdiction must specially appear for that purpose only; otherwise, they waive their right to make the objection. (See *California Dental Assn.* v. *American Dental Assn.* (1979) 23 Cal.3d 346, 352 [152 Cal.Rptr. 546, 590 P.2d 401].) ■ It is irrelevant that Nancy appeared after entry of judgment, because such appearances cure "any defect arising from the lack of jurisdiction due to the failure to serve or notify a person of the proceedings [citations], and a judgment based upon such an appearance is valid." (*Farmers etc. Nat. Bk.* v. *Superior Court* (1945) 25 Cal.2d 842, 846-847 [155 P.2d 823].)

■ Accordingly, we conclude that the paternity judgment is not void on any ground. Therefore, Nancy cannot appeal the denial of the trial court's

motion to vacate the paternity judgment, which was entered pursuant to stipulation. "[A] stipulation for a judgment is a consent to the entry of the judgment and is a waiver of errors by the party consenting thereto." (*Davison v. Anderson* (1954) 125 Cal.App.2d Supp. 908, 910 [271 P.2d 233].) Because Nancy consented to the paternity judgment, thereby waiving any errors, it is not void upon its face, and there remains nothing else for us to review. (*Reed v. Murphy, supra,* 196 Cal. at p. 401.) Thus, we make no determination of Nancy's argument that section 7005, subdivision (b), precludes Timothy from being adjudged as Matthew's father. (See *Atchison, T. & S. F. Ry. Co.* v. *Hildebrand, supra,* 238 Cal.App.2d at p. 863.)

 Finally, even if the order were otherwise appealable, we would not address Nancy's argument for two additional reasons. First, Nancy's conduct equitably estops her from challenging Timothy's paternity. More specifically, Nancy was impregnated with Timothy's sperm; she gave birth to Matthew with the intention that Timothy would be his father; she signed the surrogate contract designating Timothy as the natural father; she named Timothy as father on Matthew's birth certificate; she executed the Release allowing Timothy to take Matthew home from the hospital; she signed the stepparent adoption consent, which states that Matthew "is the child of" Timothy, the "Natural Father," and Nancy, and that the consent is "to be used only when parent is giving . . . custody of child to husband or wife of *other parent*" (italics added); and she referred to Timothy as the natural father in her original petition to withdraw consent, which did not seek relief on the ground that Timothy was not Matthew's father. In reliance on Nancy's conduct, Timothy sought and obtained a judgment of paternity rather than seeking to adopt Matthew himself, initiated the stepparent adoption with Charlotte premised on the paternity judgment, and has cared for Matthew since birth as his legal father. From Matthew's perspective, he has formed father-son bonds with Timothy based on the understanding that Timothy is his father.

On these facts, we find that Nancy's conduct equitably estops her, as a matter of law, from challenging Timothy's paternity. (See *Guardianship of Ethan S.* (1990) 221 Cal.App.3d 1403, 1416-1417 [271 Cal.Rptr. 121] [estoppel precludes a party who represented that child was natural father's son from contesting natural father's paternity]; *De Weese* v. *Unick, supra,* 102 Cal.App.3d at p. 107 [defendant, who "made an intelligent waiver of his rights in stipulating with the aid of counsel in admitting to paternity . . . ," is equitably estopped from attacking paternity judgment].) We cannot allow Nancy, who even now does not claim that Timothy is not in fact Matthew's father, to challenge Timothy's paternity only to derail the stepparent adoption. (See *In re Marriage of Valle* (1975) 53 Cal.App.3d 837, 842 [126 Cal.Rptr. 38] [father estopped where paternity denied only to defeat mother's

claim to children, and father showed continued willingness to support children even in absence of paternity if court awarded him custody].) A contrary result would do disservice to the state's interest in "preserving existing father-child relationships . . . ." (*Guardianship of Ethan S., supra,* 221 Cal.App.3d at p. 1417.)

██ Second, an interpretation of section 7005, subdivision (b), that precludes Timothy from seeking to establish paternity would be unconstitutional as applied to Timothy. "[T]he interest of an unwed father in his children is not only cognizable but also of sufficient substance to warrant deference except when the deprivation comports with equal protection and due process requirements." (*In re Lisa R.* (1975) 13 Cal.3d 636, 648 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017].) Assuming that section 7005, subdivision (b), creates a presumption that Timothy cannot be a presumed father, his right to rebut the presumption depends on a weighing of the competing private and state interests. (*In re Lisa R., supra,* at p. 648.) Timothy's private interest stems from both his biological connection to Matthew and his conduct as Matthew's father. Matthew was conceived with the intention that Timothy would raise him, and Timothy has faithfully carried out his responsibility. Starting three days after Matthew's birth, Timothy took Matthew into his home and has loved and cared for Matthew as his father. Moreover, the state's interest in maintaining the integrity of the family and protecting the child's welfare weighs in favor of permitting Timothy to establish paternity. (See *In re Melissa G.* (1989) 213 Cal.App.3d 1082, 1089 [261 Cal.Rptr. 894] [finding irrebuttable presumption unconstitutional].) By everyone's testimony, Timothy is the only father of Matthew, and the application of any contrary presumption would destroy the parent-child relationship and the bond that exists between them. Therefore, section 7005, subdivision (b), cannot constitutionally be applied to prevent Timothy from seeking to establish paternity. (See *Fuss* v. *Superior Court* (1991) 228 Cal.App.3d 556, 562-563 [279 Cal.Rptr. 46].)

CONCLUSION

Contract law has long played a role in the ordering of familial relationships, including the rights of child custody and visitation. Perhaps the oldest example of this involvement is found in the legal principles that govern the solemn and sacred contract of marriage. A more recent but no less important example is found in the legal principles governing adoptions. By using these well-settled principles to resolve the dispute in this case, we do not mean to suggest that children are commodities. The child's best interests remain the most important consideration.

Nor by this opinion do we determine the validity of surrogate contracts. Surrogacy raises many constitutional, public policy, and human questions

that we do not discuss in this opinion. It is, of course, for the Legislature to consider these important questions and provide answers through legislative action. Given the impact of surrogacy on both public policy and private lives, we urge the Legislature to do so expeditiously. Absent legislative guidance, the courts of necessity will ultimately be called upon to determine the questions associated with surrogacy because disputes involving surrogate contracts will no doubt continue to find their way into the courts.

However, because the parties in this case fully performed their surrogate agreement, different public policy questions are raised. Here, Nancy's release of Matthew to the M.'s for parenting, her stipulation to Timothy's paternity, and her execution of the consent to Charlotte's adoption of Matthew moot the debate about the desirability of surrogate contracts. Rather, the best interests of Matthew must now be our paramount concern. The trial court properly recognized this fact in refusing to decide whether the surrogate contract was illegal and in denying Nancy's petition as not in Matthew's best interests. The trial court did not err.

The order denying the petition to withdraw consent to adoption (action No. A044280) is affirmed. The appeal from the order denying the motion to vacate the judgment of paternity (action No. A045711) is dismissed.

White, P. J., concurred.

**STRANKMAN, J.**—I concur in the opinion and the judgment because I believe that this result is the most rational outcome attainable given the existent position of the parties. While the legal theories that are used to reach this result are consistent with current California law, I am not satisfied that our legal tools are the best that can be designed for handling this evermore prevalent social practice. In particular the use of contract theory in this area is awkward and clumsy. Children are not commodities and should not have their fates decided on the basis of commercial contract theory.

Further I wish to distance myself from any implication that the result in this case is an implicit approval of the procedures that resulted in the birth of Matthew. For my part I would have no hesitancy in finding surrogate parent contracts illegal under current California law were we required to reach that issue. Recent legislative activity indicates that soon a court may have to determine whether a yet to be enacted statute is constitutional. This opinion explicitly and wisely does not reach these troublesome issues. In this area

good rhetoric comes easier than wise policy. Our opinion shuns the opportunity for the former and leaves for the Legislature the formulation of the latter.

Petitions for a rehearing were denied August 28, 1991, and August 29, 1991, and appellant's petition for review by the Supreme Court was denied November 21, 1991.