Filed 4/4/13  Guardianship of Hughes CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| Guardianship of ALEXANDER REYNOLDS HUGHES, a Minor. | |
| MITCHELL, SILBERBERG & KNUPP, LLP, et al., <br><br> Petitioners and Appellants, <br><br> v. <br><br> SUZAN HUGHES, as Guardian, etc., et al., <br><br> Objectors and Respondents; <br><br> JOHN REYNOLDS, as Cotrustee, etc., et al., <br><br> Objectors and Appellants. | A130802 <br><br> (Los Angeles County <br> Super. Ct. No. BP 062817) <br><br> **ORDER MODIFYING OPINION, AND DENYING PETITION FOR REHEARING** <br> **[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion filed herein on March 6, 2013, be modified as follows:

On page 6, replace the word **"**Referee" in heading number II, so the heading now reads:

### II.     Did the Fact-Finder Apply the Proper Legal Standard?

On page 9, replace the word **"**Referee" in heading number III, so the heading now reads:

### III.    Does Substantial Evidence Support the Fact-Finder's Factual Findings?

The Petition for Rehearing filed March 20, 2013 is denied.  There is no change in the judgment.

DATE:                                    _____

                                         MCGUINESS, P.J.

Filed 3/6/13  (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Guardianship of ALEXANDER REYNOLDS HUGHES, a Minor. | |
| MITCHELL, SILBERBERG & KNUPP, LLP, et al.,<br><br>          Petitioners and Appellants,<br><br>v.<br><br>SUZAN HUGHES, as Guardian, etc., et al.,<br><br>          Objectors and Respondents;<br><br>JOHN REYNOLDS, as Cotrustee, etc., et al.,<br><br>          Objectors and Appellants. | A130802<br><br>(Los Angeles County<br>  Super. Ct. No. BP 062817) |

        This is an appeal from a trial court order denying the request of petitioners and appellants Mitchell Silberberg & Knupp and Hillel Chodos (collectively, petitioners) for an award of several million dollars in attorney fees for legal services they provided on behalf of the Guardianship of Alexander Reynolds Hughes (the guardianship), at the direction of objector and respondent Suzan Hughes, as Guardian (guardian).  Objectors and appellants John Reynolds, Conrad Klein and Christopher Pair (collectively, cotrustees), in turn, appeal from the portion of the trial court order requiring them to pay 100 percent of the fee charged by the referee appointed to consider petitioners' fee request.  For reasons set forth below, we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

Mark R. Hughes (Mark),[1] the founder of Herbalife International, Inc. (Herbalife), died in 2000. Pursuant to his will, Mark's only son, Alexander Hughes, born in 1991, was named primary beneficiary of his estate. This estate includes the Mark Hughes Family Trust (trust), which originated with assets worth approximately $320 million, scheduled to be distributed to Alexander when he reaches age 35; and a custodial account (custodianship), which originated with assets worth approximately $40 million, scheduled to be distributed to Alexander when he reaches age 25. After Mark died, respondent John Reynolds, Alexander's grandfather, was named custodian of the custodianship. This position is currently held by respondent Fred Siegel (custodian). Mark also named Reynolds as a cotrustee, along with cotrustees Klein and Pair.

Respondent Suzan Hughes (Suzan), Alexander's mother, was named Alexander's court-appointed guardian. As guardian, Suzan oversees a guardianship account on behalf of Alexander. At the time of Mark's death, Suzan and Mark, who had been divorced several years, were bound by a Marriage Settlement Agreement (MSA). Under the MSA, Suzan was paid $6 million for her share in the family residence, $33,000 per month in spousal support for 10 years, $3.95 million to purchase a residence for Ms. Hughes and Alexander, a $500,000 furniture allowance for the home, $10,000 per month in child support while Alexander remained a minor, and payment of all Alexander's medical and educational expenses while he remained a minor. In addition, the MSA set forth Suzan's acknowledgment that she had no further interest in the trust, and that the sums payable to her under the MSA sufficed to maintain the lifestyle she and Alexander enjoyed before the divorce.

Since shortly after Mark's death, Suzan, the cotrustees and the custodian have been engaged in rounds of litigation relating to various aspects of Mark's estate. For much of this litigation, Suzan was represented by petitioner Chodos (Chodos), a sole practitioner, and petitioner Mitchell Silberberg & Knupp (MSK), a large law firm. In late 2008 and early 2009, petitioners filed separate petitions seeking extraordinary compensation for legal work performed for their client, Suzan, in her capacity as guardian, between years 2002 and 2008.

---

[1] Members of the Hughes' family are referred to by their first name for ease of identification and clarity, and we mean no disrespect thereby.

These petitions were handled jointly by the trial court and, thus, are referred to herein as "the fee petition." Pursuant to the fee petition, Chodos, who had already been paid over $630,000 for his legal work performed at Suzan's direction for the guardianship, sought an additional $1.75 million. MSK, which had already been paid nearly $2.4 million for such work, sought an additional $1.307 million.

Several interested parties opposed petitioners' fee petition in full or part — to wit, Suzan in her capacity as guardian; Siegel in his capacity as custodian; and Klein, Pair and Reynolds, in their capacity as cotrustees.

On April 29, 2009, the trial court issued an order appointing the Honorable Richard Neal, Retired, as referee pursuant to Code of Civil Procedure section 639, subdivision (a)(1) and (a)(2), to "hear . . . all issues of fact or law necessary or appropriate to make a recommendation as to the amount of additional attorneys' fees, if any, to be paid to petitioners Hillel Chodos and/or Mitchell Silberberg & Knupp . . . ."[2] This order required the referee to "consider the factors set forth in the California Rules of Court, statutes and cases," and, in particular, to "consider, among other things, the amount of time spent, the appropriate billing rate(s), the success, and the benefit to Alexander Reynolds Hughes of the services performed." Following a hearing held over five and a half days, at which the parties offered extensive live testimony, documentary evidence and argument, the referee issued a final report recommending petitioners' request for additional compensation be denied, that petitioners collectively pay 40 percent of his $99,640.21 fee, and that the trust pay the remaining 60 percent of his fee.

Petitioners objected to the referee's report and, specifically, to the recommendation to deny their request for additional compensation. Neither Suzan nor Alexander, who by the time the referee's report was filed had reached the age of maturity, objected to this recommendation.[3] The trial court heard argument relating to these objections at a hearing held September 2, 2010 before taking the matter under submission.

---

[2]     Unless otherwise stated, all statutory citations herein are to the Code of Civil Procedure.

[3]     Suzan objected only to certain statements in the report she deemed "gratuitous." Alexander submitted an "Opposition to Motion . . . to Strike and Remove from the Court's

On October 8, 2010, the trial court issued an order adopting the referee's recommendations in whole with one exception. The trial court agreed with the recommendation petitioners receive no further compensation for their legal work performed on behalf of the guardianship, but rejected the recommendation the parties share the burden of paying the referee's $99,640.21 fee. Instead, the trial court ordered the trust to pay 100 percent of this fee. Petitioners and the cotrustees have both appealed from this order.

## DISCUSSION

Petitioners contend the trial court erred in adopting the referee's recommendation to deny their request for an award of additional attorney fees for legal services provided for the guardianship on several grounds. First, petitioners contend the order was erroneous as a matter of law, because the referee applied an improper legal standard. Second, petitioners contend the referee's recommendation to deny additional compensation was not supported by substantial evidence. Lastly, petitioners contend the trial court violated their rights to due process by adopting the referee's recommendation and findings without conducting an independent review.

On cross-appeal, the cotrustees challenge the trial court's order, contrary to the referee's recommendation, to impose upon the trust the obligation to pay the referee's entire $99,640.21 fee.

## I. The Governing Legal Standards.

Petitioners' entitlement to attorney fees is governed by Probate Code, section 2642, subdivision (b) and California Rules of Court,[4] rule 7.702, which rule is made applicable to guardianships pursuant to rules 7.750 and 7.751.[5] Pursuant to this legal framework,

---

Calendar Petitions of [Petitioners] to Instruct Guardian to Pay Attorneys' Fees," accompanied by a two-volume Request for Judicial Notice that included the reporter's transcripts from the reference proceedings. In his filing, Alexander expressed certain concerns, not relevant here, regarding the precedential effect of the referee's findings.

[4]   All further citations to the rules in this opinion are to the California Rules of Court.

[5]   Belatedly, petitioner MSK contends the proper rule with respect to awarding fees from a custodianship is Probate Code section 3914, subdivision (b), which gives the trial court discretion to order disbursement of custodianship assets where "advisable for the use and benefit of the minor." We note, however, that petitioners' fee petition, was brought under Probate Code, section 2642, subdivision (b), and that, in any event, even assuming for

attorneys, like petitioners, who render legal services to a guardian or estate or both, may file a petition for extraordinary compensation.  The petition is required to include or be accompanied by a statement of the facts that accomplishes each of the following: "(1) Show[s] the nature and difficulty of the tasks performed; [¶] (2) . . . the results achieved; [¶] (3) . . . the benefit of the services to the estate; [¶] (4) Specif[ies] the amount requested for each category of service performed; [¶] (5) State[s] the hourly rate of each person who performed services and the hours spent by each of them; [¶] (6) Describe[s] the services rendered in sufficient detail to demonstrate the productivity of the time spent; and [¶] (7) State[s] the estimated amount of statutory compensation to be paid by the estate, if the petition is not part of a final account or report." (Rule 7.702.  See also rule 7.751 ["All petitions for orders fixing and allowing compensation must comply with the requirements of rule 7.702 . . . except that the best interest of the ward . . . is to be considered instead of the interest of beneficiaries of the estate"].)  Then, following a hearing if the matter is contested, the court must make an order awarding in an amount charged against the estate "such compensation as the court determines reasonable to the attorney for services rendered to the guardian . . . ." (Prob. Code, § 2642, subd. (b).)

On appeal, a trial court's order on a petition for attorney fees is generally reviewed for abuse of discretion.  (*Terry v. Conlan* (2005) 131 Cal.App.4th 1445, 1461; *Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1230 ["Allowance of litigation expenses rests in the sound discretion of the trial court, whose ruling will not be disturbed on appeal absent an abuse"].)  Of course, issues regarding the proper legal basis for awarding attorney fees are reviewed de novo.  (*Sessions Payroll Mgmt., Inc. v. Noble Construction Co*. (2000) 84 Cal.App.4th 671, 677.)  And "[i]f application of the rule of law to the facts requires an inquiry that is 'essentially factual' . . . [the decision is] reviewable under the clearly erroneous standard." (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800-801.)

---

the sake of argument the standards for custodianships and guardianships are somehow different in substance, the result in this case is the same – to wit, petitioners are entitled to no more compensation.

## II.     Did the Referee Apply the Proper Legal Standard?

Petitioners contend the order on their fee petition (fee petition order) must be reversed because it stems from an erroneous legal premise — to wit, that petitioners had to prove their services provided an essential benefit to the guardianship estate.  According to petitioners, this premise is erroneous, and requires reversal, because California law required them to prove only that the amount of fees requested was reasonable.[6]  In fact, Chodos goes so far as to argue that, "[o]n an application for attorney fees, the trial court is simply not entitled to second-guess the Guardian's decisions as to what was of benefit to the Guardianship estate."  Rather, Chodos contends, guardianship estate attorneys are entitled to payment for their services so long as they "acted in good faith in accordance with their fiduciary duties to the Guardian, their client."  However, petitioners, not the referee or the trial court, are confused.

Indeed, petitioners do not deny that they agreed in writing to the terms of the reference order in this case.  Nor can they.  The Joint Status Report filed with the trial court and signed by both petitioners on April 9, 2009, expressly states the parties agree to appointment of a referee pursuant to section 639 to consider petitioners' fee petition.  Moreover, this agreement expressly defines the scope of the referee's authority in considering the petition — to wit, "to hear any and all issues of fact or law necessary or

---

[6]     Petitioners make a preliminary argument that we should disregard the referee's report, and the trial court's adoption of its conclusion that they are entitled to no further compensation, because the referee filed the report nine days late.  Under section 643, a referee appointed, as here, pursuant to section 639 must file with the court the final report within 20 days after the hearing has been concluded and the matter submitted.  (§ 643, subds. (a), (c).) According to petitioners, this statutory requirement is mandatory and the referee's failure to comply with it renders his final report a legal nullity.  We disagree.  As a plethora of California case law recognizes, procedural rules specifying mandatory timeframes for adjudicatory bodies to render decisions are directory, not jurisdictional, and thus failure to comply with the rules provide no basis for invalidating otherwise valid judgments.  (*Koll Hancock Torrey Pines v. Biophysica Found. Inc*. (1989) 215 Cal.App.3d 883, 887, and cases cited therein ["statutes . . . specifying mandatory timeframes for adjudicatory bodies to render their decisions, are almost universally construed as directory rather than jurisdictional"].)  Because petitioners have offered no reason for disregarding this generally accepted principle in this case, we reject their argument and proceed to the next issue without further discussion.

appropriate to make a recommendation as to the amount of additional attorneys' fees, if any, to be paid to [petitioners] and from what source[s] such fees, if any, are to be paid." This report also orders the referee to consider specific factors, including the extent to which petitioners' services were successful and beneficial to Alexander: "The Referee shall consider the factors set forth in the California Rules of Court, statutes and cases, and shall consider, among other things, the amount of time spent, the appropriate billing rate[s], the success, *and the benefit to Alexander Reynolds Hughes of the services performed*." (Emphasis added.) A formal order appointing Justice Neal (Ret.) as referee pursuant to these agreed-upon terms was issued by the trial court on April 29, 2009, and thus became binding on the parties. Under these circumstances, we reject petitioners' argument that a different standard from that set forth in this order of reference and based on the parties' agreement should have applied. (See *Sy First Family Ltd. Partnership v. Cheung* (1999) 70 Cal.App.4th 1334, 1341 [where parties entered into a stipulation purporting to send the matter to a referee pursuant to § 638, the parties were bound by ordinary contract principles]; *Dallman Co. v. Southern Heater Co*. (1968) 262 Cal.App.2d 582, 591 [rejecting litigant's argument that the referee lacked authority to make certain findings of fact where the parties stipulated to such authority in the reference]. Cf. *DeGuere v. Universal City Studios* (1997) 56 Cal.App.4th 482, 503-505 [the referee exceeded his authority under § 639(a) by ruling on legal issues of contract interpretation and enforceability because "the trial court was not entitled to refer any matter beyond examination of a long account to the referee, unless the parties agreed, and they did not"].)

And in any event, we note the order of reference entered in this case was entirely consistent with California law, which generally requires petitioners to prove their entitlement to fees based on all relevant factors, including, but not limited to, the benefit of their services to the guardianship. (Rule 7.702; see also *Estate of Trynin* (1989) 49 Cal.3d 868, 874 ["benefit to the estate is one of the factors to be weighed by the court in fixing compensation"].) [7] Moreover, "[w]here the trial court reasonably concludes that the

---

[7] Petitioners insist rule 7.702 is merely a procedural rule setting forth the information required to be included in a fee petition. It does not, they claim, set forth "substantive elements" required to be proven by the claimant in order to prevail. Petitioners' argument is

amounts previously awarded the attorney for both ordinary and extraordinary services are adequate, given the value of the estate and the nature of its assets, to fully compensate the attorney for all services, including fee-related services, denial of a request for fee-related fees would not be an abuse of discretion." (*Estate of Trynin, supra,* 49 Cal.3d at p. 880.) As more recent California case law makes clear: " 'The underlying principle which guides the court in allowing costs and attorneys' fees incidental to litigation out of a trust estate is that such litigation is a benefit and a service to the trust.' [Citation.] Consequently, where the trust is not benefited by litigation, or did not stand to be benefited if the trustee had succeeded, there is no basis for the recovery of expenses out of the trust assets." (*Whittlesey v. Aiello, supra,* 104 Cal.App.4th at p. 1230. Accord *Thomas v. Gustafson* (2006) 141 Cal.App.4th 34, 44; *Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 269-270.)

The record before us reflects the referee and the trial court thereafter applied the appropriate legal standard. For example, the trial court adopted the referee's conclusion that no further fees were payable by the estate because adequate compensation had already been paid for the services provided for the benefit of the estate. Contrary to petitioners' claims, this conclusion did not stem from a finding that their services failed to result in economic success or "a traditional judicial win." Rather, it stemmed from several of the referee's findings later adopted by the trial court, the most significant of which was that the services for which compensation was sought provided little or no benefit of any sort, tangible or non-tangible, to the guardianship estate.[8] The referee also found many of the services provided were motivated by Suzan's personal agenda or animus toward the cotrustees (or her former husband) rather than by the interests of the guardianship. Finally, with respect to Chodos, the referee found relevant to its decision the absence of detailed and reliable contemporaneous time records, which were particularly important given the

---

of no consequence, however, because, as set forth above, the requirements of rule 7.702 are wholly consistent with California case law. (E.g., *Thomas v. Gustafson, supra,* 141 Cal.App.4th at p. 44; *In re Estate of McDonald, supra,* 37 Cal.App.2d at p. 527; *Donahue v. Donahue, supra,* 182 Cal.App.4th at pp. 269-270.)

[8] As will be discussed, *post* (see pp. 11-12 & fns. 9, 10), the lower court acknowledged certain instances where petitioners' litigation initiatives would have harmed the guardianship even if they had been successful in court.

extraordinarily high rate ($1,000 per hour) charged by the attorney for his services. Whether, however, the trial court had a proper *evidentiary basis* for these findings is a separate, factual issue left to the court's discretion. (E.g., *In re Estate of McDonald* (1940) 37 Cal.App.2d 521, 527 [the fee award is "is a matter generally left to the sound discretion of the probate court, based upon the necessity for and the nature of the litigation, its difficulty, the amount involved, the skill required and employed, the attention given, the success or failure of the attorneys' efforts, including the amount of recovery, and other similar considerations"]; *Thomas v. Gustafson, supra,* 141 Cal.App.4th 34, 44.) It is to this issue we now turn.

### III.    Does Substantial Evidence Support the Referee's Factual Findings?

Petitioners challenge on evidentiary grounds several of the factual findings underlying the decision to deny their request for additional compensation. Turning first to petitioners' petition to compel the cotrustees to distribute various sums of money and properties to the guardianship ("Distribution and Reimbursement Petition"), for which they sought an amount of approximately $1.4 million, the referee concluded the cotrustees had paid all sums due under the MSA and that no evidence was offered that these "generous sums" were insufficient to support Alexander at the level he was accustomed to at the time of Mark's death. This accords with the tentative ruling of the trial court hearing the underlying petition that Suzan was not entitled to personally receive trust and custodianship monies. After this tentative ruling, Suzan dismissed the petition. Likewise, in this appeal, petitioners have identified no evidence demonstrating any need for or benefit from the Distribution and Reimbursement Petition. As such, they have demonstrated no abuse of discretion arising out of the referees' finding as to this petition. (*Whittlesey v. Aiello, supra,* 104 Cal.App.4th at p. 1230.)

The referee also found "implausible" Suzan's claim that Alexander, rather than she, desired most of the properties and monies sought under the petition, including valuable home furnishings and a $100,000 summer rental property. Similarly, the trial judge hearing (and tentatively denying) the underlying petition called Suzan's claim that Alexander desired the requested items "ridiculous" because they were "not appropriate for the youngster." The referee and trial court were entitled to accept these conclusions. (See

*Donahue v. Donahue, supra*, 182 Cal.App.4th at p. 270 ["If litigation is necessary for the preservation of the trust, the trustee is entitled to reimbursement for his or her expenditures from the trust; however, if the litigation is specifically for the benefit of the trustee, the trustee must bear his or her own costs incurred, and is not entitled to reimbursement from the trust"].)

We next address the guardianship's petitions to remove the cotrustees and custodian for alleged breaches of fiduciary duties, including mismanagement of assets, for which petitioners sought an amount of approximately $850,000. The referee noted the first petition to remove the cotrustees, filed in 2001, resulted in summary judgment in favor of the cotrustees, a decision upheld on appeal. Other such petitions have yet to be heard. When the 2001 petition was filed, Alexander's guardian ad litem told Suzan's counsel there was no evidence to support it and that many of the factual allegations in the petition were inaccurate. Regarding the other removal petitions, the referee found "little showing and no preponderant evidence" of misconduct or other circumstance demonstrating removal was necessary or beneficial to the guardianship. In particular, the referee rejected petitioners' request for legal fees related to their contention that trustee mismanagement had caused a steep decline in the estate's value, finding they presented "no expert testimony, no economic analysis, and no mention of the economic events of the last several years which might have caused significant decline even in well managed portfolios." The record supports the referee's conclusion the petitions lacked an evidentiary foundation. As such, there is no basis for reversal on appeal.[9]

---

[9]     Petitioner Chodos claims the 2001 removal petition was "necessary and appropriate" in part because it put pressure on the cotrustees to sell Herbalife, which occurred before the hearing on the petition and thus rendered moot some claims raised therein. Yet substantial evidence proved the cotrustees were already in the process of finding a buyer for Herbalife when Suzan filed the petition.

Further, the referee acknowledged the petition to remove Custodian Jack Reynolds was partially successful because he resigned before the court's tentative ruling to remove him for failure to segregate custodial property from the trust became final. However, success with respect to one or a few litigation objectives does not require reversal of the order denying petitioners *additional* compensation.

The referee also considered and rejected petitioners' request for a combined $488,000 for legal services related to various trust accountings, and nearly $112,000 combined for their review of seven fee petitions filed by Alexander's guardian ad litem. Awarding no compensation for these services, the referee found that "no challenge was ever raised to these bills, nor did the applicants make a showing of facts or circumstances raising concerns about the bills justifying close and expensive scrutiny of them." It was within the lower court's discretion to find charging over a half million dollars for legal services related to uncontested fee petitions was excessive and warranted no further payment. Petitioners offer nothing from the record to suggest otherwise.

The sum of $300,000 was requested for petitioners' services opposing the so-called *Graegin* tax savings plan. The cotrustees proposed the plan to save the estate many tens of millions of dollars in estate taxes; the guardianship opposed it on the ground that any tax savings would be largely offset by income tax increases and additional encumbrances on estate assets that could postpone payment of distributions to Alexander on his 35th birthday. Before filing the opposition, MSK's tax attorneys advised Suzan the plan would save the estate tens of millions of dollars in taxes, and Alexander's guardian ad litem warned that opposing it was "irresponsible," "appalling" and "potentially very harmful." Nonetheless, MSK pursued the opposition to its unsuccessful conclusion at the appellate level, and the *Graegin* plan was ultimately consummated. This evidence, including MSK's own acknowledgement before filing the opposition that the plan would generate significant tax savings, supports the referee's finding that "the transaction benefited the estate, resulting in a net savings of several tens of millions of dollars," and that petitioners' opposition to it was harmful, and would have been even if successful.[10]

---

[10]  Petitioners claim the referee misunderstood their opposition to the *Graegin* plan, insisting they did not oppose the tax savings plan in concept; they opposed the cotrustees' attempt under the plan to insulate or exonerate themselves from future liability and to avoid full disclosure or analysis of the plan. However, as the trial judge who heard the opposition commented when criticizing Suzan's decision to appeal: "[I]f Suzan had prevailed on the appeal, I don't know what would have happened with respect to the feds and the tax consequence of that. You know, I think it had a disastrous possibility and should have been examined — there should have been a better balance drawn between the possible benefit of saying, 'Gee, maybe this is not as good a deal as portrayed in terms of the tax benefits to the

Petitioners also sought $60,000 in fees relating to their work opposing the cotrustees' request for access to Alexander. Below, the trial court hearing their opposition rejected their position, finding the cotrustees needed access to Alexander to effectively discharge their duties and the guardianship had failed to put forth any valid reason for restricting it. The referee agreed, concluding Suzan was motivated by her own personal animus toward the cotrustees or perhaps toward her former husband rather than by a legitimate need to restrict access. We defer to this reasonable conclusion, which was based in part on the referee's observations of the cotrustees and Suzan in open court, observations not available to this court.[11] (*Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1254 ["[i]t is the duty of the trier of fact to determine the credibility of witnesses and the value of evidence and to resolve any evidentiary conflicts].)

Petitioners sought $120,000 ($60,000 each) for services relating to Suzan's unsuccessful efforts to purchase Herbalife, which was later sold for nearly twice Suzan's offer to another buyer. With respect to Chodos, the referee denied fees because he was not retained until after Herbalife was sold, a finding Chodos does not dispute. With respect to MSK, the referee found that, had the law firm succeeded in its efforts on Suzan's behalf to buy the company, the estate would actually have been harmed by the sale of trust assets at a "deeply discounted value."[12] Petitioners dispute the referee's finding and contend that buying a valuable asset like Herbalife for the guardianship at a discounted price would have

---

trust, to the estate.' . . . And, you know, we can cause an awfully serious and expensive problem pushing [the opposition]. I don't think that evaluation took place." And in declining to award Suzan fees in connection with her opposition, the judge added: "[T]here is no reward for that kind of litigation." Given the many voices expressing disagreement, if not dismay, at Suzan's opposition efforts, we find no basis for rejecting the referee's reasonable conclusion that no benefit arose from this pursuit.

[11] The court did restrict the access of trustee Pair to Alexander in light of an ongoing, and ultimately unsuccessful, sexual harassment lawsuit brought by Suzan against Pair.

[12] Petitioners' claim, noted above, that the trial court erred by limiting the legal definition of "benefit" to judicial success is belied by the referee's finding that Suzan's plan to purchase Herbalife, even if successful, would have harmed the guardianship estate by causing the sale of its assets at a deeply discounted price. The referee likewise found that, even if petitioners had successfully opposed the *Graegin* plan, Alexander's interests would have been harmed by the resulting increase in the estate's tax liability.

benefitted the guardianship. This argument, we note, contradicts Chodos's description that the sale of Herbalife was designed to address the cotrustees' refusal to diversify estate assets. In any event, we conclude the lower court did not abuse its discretion when finding the sale of Herbalife to Suzan at a very low price would not have benefitted the guardianship given other parties' willingness to pay substantially more.

In addition, petitioners sought the combined sum of approximately $275,000 for their work on a petition challenging various aspects of the trust's management of trust-owned LLCs (hereinafter, the LLC petition). Summary judgment was granted in favor of the cotrustees after the trial court sustained 154 of the cotrustees' 159 evidentiary objections and concluded the guardianship's opposition was "entirely devoid of facts." The guardianship appealed the ruling; however, the appeal was ultimately dismissed at the advice of the guardianship's successor counsel, Bingham McCutchen (Bingham), which replaced petitioners as counsel. Chodos nonetheless claims the LLC petition was beneficial because it forced the cotrustees to disclose detailed information about the LLCs' finances and to fund the custodianship with millions of dollars of much needed cash. However, Chodos offers no evidence to prove these claims and, thus, no basis for reversing the lower court.

Thus, based on the foregoing discussion, we conclude substantial evidence did in fact support the lower court's ultimate finding that petitioners' litigation initiatives were, for the most part, of no essential benefit to the guardianship. In doing so, we hasten to add that this finding was not the sole basis for recommending petitioners receive no additional compensation. The referee also relied on the "substantial evidence demonstrating that Ms. Hughes was motivated, not by intent to benefit the guardianship, but by animus against the cotrustees, and perhaps her former husband" in deciding against awarding additional fees. Pointing to Suzan's testimony that the cotrustees were a "gang out to deprive Alex of his rights," the referee observed "Ms. Hughes' animosity to the cotrustees was strongly on display during the hearings." We defer to the lower court's superior credibility findings, based in large part on the referee's observations of Suzan and other witnesses during live testimony. (*Adoption of Matthew B., supra,* 232 Cal.App.3d at p. 1254.) While petitioners may be correct that any improper motivation exhibited by Suzan is not imputable to them,

the referee was nonetheless entitled to consider a party's motivation when assessing the broader issue of whether fees were reasonably incurred. (See *Whittlesey v. Aiello, supra,* 104 Cal.App.4th at pp. 1230-1231.)

Finally, as to Chodos, the referee relied on his failure to produce contemporaneous billing records, even though his billing rate was "at the very top end of the range" charged by his peers and "would have been off the charts a few years ago." And while MSK may have charged reasonable rates and produced detailed contemporaneous records, the referee found these circumstances were not enough to overcome the fact that MSK had already been adequately compensated for its services given the relatively few essential benefits arising from them. Again, the referee's findings in this regard were appropriately supported. (See *ComputerXpress, Inc. v. Jackson, supra,* 93 Cal.App.4th at p. 1020 [the court may properly reduce attorney compensation for failure to maintain adequate time records].)

## IV.    Do Other Factual Grounds Exist for Reversing the Order?

Petitioners, in addition to pointing to the alleged benefits of their various litigation initiatives, set forth several other fact-based arguments for reversing the lower court order. First, petitioners rely on their own good faith in pursuing those initiatives, a fact that does not appear to be in dispute. As petitioners note, the referee stated that, had petitioners sought to recover fees from Suzan personally rather than the estate, he would not hesitate to recommend awarding them. Second, petitioners rely on the fact many of the initiatives continue to be pursued by the guardian's successor counsel or by Alexander, who has reached age 18 and is capable of pursuing his own litigation. Finally, petitioners rely on the fact the trial court had previously approved significant payments of fees to petitioners or to successor counsel pursuing the same legal initiatives from the guardianship or custodianship.

With respect to petitioners' good faith, they correctly note Suzan's admission that she directed and approved all litigation initiatives because she believed them to be in the guardianship's best interests. However, even assuming petitioners were acting in good faith and in accordance with Suzan's instructions, under the law set forth above, a court considering a fee petition is entitled to consider other relevant factors, including whether the underlying services were reasonably and prudently incurred for the guardianship's benefit

and whether the amount requested is reasonable.[13]  (*Whittlesey v. Aiello, supra,* 104 Cal.App.4th at pp. 1230-1231; rule 7.702.)  And, as noted above, the lower court was entitled to consider a party's motivation when assessing the reasonableness of the fee request.  (See *Whittlesey v. Aiello, supra,* 104 Cal.App.4th at pp. 1230-1231.)  That is particularly true here because the record reflects MSK itself relied upon Suzan's questionable tactics when withdrawing as counsel.  Specifically, MSK advised Suzan by letter that her "opposition to [the firm's] recommendations as to what may be in the best interests of Alex and the Guardianship" was a motivating factor in their decision to withdraw.  (See *Donahue v. Donahue, supra,* 182 Cal.App.4th 259, 268 ["To recover fees and costs, cotrustees must subjectively believe the expense was necessary or appropriate to carry out the trust's purposes, and they must show their beliefs were objectively reasonable"].)  Moreover, while petitioners rely on Suzan's testimony that she directed and approved their activities, they disregard her other testimony denying the guardianship benefitted from their activities.  The trial court was entitled to credit this portion of her testimony.

With respect to the legal activities of other lawyers, including those of successor counsel and Alexander's counsel, we simply note those activities are not before us and, in any event, are of little relevance.  The mere fact other people pursued the same litigation initiatives says nothing of the wisdom, necessity or effectiveness of those initiatives.  Moreover, evidence of what other lawyers did or are doing does not change the outcome of this case, given that the lower court's findings, as discussed above, were adequately supported by the record.[14]

---

[13]    Petitioners insist that, because the compensation they already received (approximately $2.3 million to MSK and $632,000 to Chodos) was paid by Suzan personally rather than by the guardianship or custodianship, the guardianship should have to pay them $1.57 million in fees to cover the benefits it received from their services.  Their argument misses the point.  The issue is not who has adequately contributed to petitioners' fees but whether petitioners have already been adequately compensated.

[14]    For these reasons, we deny the parties' respective requests for judicial notice of various court documents filed by other attorneys before, as well as after, the conclusion of these reference proceedings.

The same is true for evidence relating to prior court orders approving fee advances from the estate to petitioners. Pursuant to those prior orders, fees were advanced to petitioners subject to the requirement that the guardianship provide future accountings to the court to validate the fees. Whether the requisite accounting was ever prepared or was sufficient to substantiate the appropriateness of the fees are, again, issues not before this court. We thus decline petitioners' request that we rely on them as evidence of the reasonableness or beneficial nature of their services.[15]

Thus, having considered the record as a whole, we agree with the trial court there is no basis for recovery of additional fees in this case. While we accept petitioners' point that the referee found some of their services reasonable and beneficial to the estate, the referee also found that many of their services were not and, in all events, that the money they had already been paid sufficed as compensation for those services that were of benefit. As our colleagues in the Fourth District, Division Three, have explained, in the probate context, "a spare-no-expense strategy calls for close scrutiny on questions of reasonableness, proportionality and trust benefit. 'Consequently, where the trust is not benefited by litigation, or did not stand to be benefited if the trustee had succeeded, there is no basis for the recovery of expenses out of the trust assets.' " (See *Donahue v. Donahue, supra*, 182 Cal.App.4th at p. 273.)

---

[15] Petitioners claim the referee erroneously refused to address Alexander's personal rights and to allow his participation once he reached age 18, and to consider evidence of other parties' legal fees and legal positions, including those of Suzan's successor counsel and Alexander's counsel. Again, they are mistaken. As the record reflects, Alexander made a substantial filing in the trial court in connection with the hearing on objections to the referee's report, which included a two-volume judicial notice request attaching exhibits and reporter's transcripts from the hearing before the referee. And even if Alexander had made no such filing, we are at a loss to find any resulting prejudice given that the referee agreed with his position that no further fees should be paid. Finally, petitioners accuse the referee of failing to recognize the distinction between Suzan, the individual, and Suzan, the guardian, and of confusing the legal nature of the custodianship. However, petitioners have put forth little evidence to prove these accusations and, assuming for the sake of argument they are correct, no evidence of any resulting prejudice. As such, there is no basis for reversal on these grounds.

## V.     Did the Trial Court Conduct an Independent Judicial Review?

We are left with petitioners' claim that the trial court impermissibly delegated its authority to the referee by adopting his findings and recommendation without conducting a sufficient independent judicial review.  As petitioners note, a litigant's constitutional rights are violated where the trial court improperly delegates its judicial authority.  (E.g., *Aetna Life Ins. Co. v. Superior Court* (1986) 182 Cal.App.3d 431, 435; *Jovine v. FHP, Inc.* (1998) 64 Cal.App.4th 1506, 1533 ("Jovine").)  For reasons set forth below, we find no violation of petitioners' constitutional rights in this matter.

Where, as here, a reference is pursuant to section 639, a referee's findings are advisory only and do not become binding unless adopted by the court after an independent review.  (*Jovine, supra,* 64 Cal.App.4th at p. 1522; § 644.)  In conducting this independent review, the court should "consider the referee's findings and any objections submitted by the parties before accepting or rejecting the referee's recommendations."  (*Rockwell Internat. Corp. v. Superior Court* (1994) 26 Cal.App.4th 1255, 1269; *Marathon Nat. Bank v. Superior Court* (1993) 19 Cal.App.4th 1256, 1261.)  "[I]n an exercise of its discretion, the trial court may consider these matters as the circumstances dictate, with or without a formal hearing--as long as the record demonstrates a considered and careful review not only of the referee's report, but also of the transcript of the proceedings held before the referee and the objections, responses and replies filed by the parties after submission of the referee's report."  (*Rockwell Internat. Corp. v. Superior Court, supra,* 26 Cal.App.4th at pp. 1269-1270.)

In this case, after the referee submitted his final report, petitioners objected to the recommendation that no additional compensation be awarded.  In doing so, petitioners filed a brief citing the relevant law and evidence, including many exhibits from the hearing, but did not file copies of the exhibits themselves.  Thereafter, the cotrustees filed a responsive brief accompanied by an appendix that included, among other things, the entire reporter's transcript of the reference proceedings and many key exhibits.  The cotrustees later filed more exhibits with the court.  In addition, Alexander filed opposition papers that included a two-volume request for judicial notice containing, among other things, a complete set of the reporter's transcripts.

In issuing the order adopting the referee's findings and recommendation to deny further compensation, the trial court stated as follows: "The court has independently considered the matter and has reviewed the documents included in Alexander Hughes' two-volume request for judicial notice. The request for judicial notice included the lengthy transcripts of the oral proceedings conducted before the Referee; the court reviewed and considered those transcripts." This statement is confirmed by the record, including the transcript from the hearing on petitioners' objections, during which the trial court frequently addressed the parties' arguments and evidence, seeking clarification or a further showing where necessary, and thereby demonstrating a reasonable familiarity with the relevant record. For example, the trial court asked MSK to explain how the $2.3 million it already received in compensation was paid, and questioned Chodos regarding his written consent to the reference in the Joint Status Report. In addition, the trial court put on calendar an evidentiary hearing on the fee petition to prepare for the possibility that it would not accept the referee's report and recommendations. Under these circumstances, we decline petitioners' request to presume the court failed to perform all judicial acts required of it. (*Marathon National Bank v. Superior Court, supra,* 19 Cal.App.4th at pp. 1260-1261 [given the well-established presumption that a trial court does what it is supposed to do, the judgment is reversed on appeal only if challenging party makes an affirmative showing that the court misconstrued its authority].)[16]

Petitioners' authority, *Jovine, supra,* 64 Cal.App.4th 1506, does not require a contrary conclusion. In *Jovine*, the trial court issued a written order "Appointing [a] *Special* Referee to Supervise, Hear and Determine *Discovery* Matters [639(e) C.C.P.]" However, without the parties' consent, the referee then heard and decided three summary adjudication motions effectively disposing of the case, and the trial court then adopted the referee's report without further review as if it were a binding judicial decision. Because "considering

---

[16] In particular, petitioners point to no authority to support their contention the trial court was required to review all exhibits admitted into evidence during the reference proceedings and to rule on all evidentiary objections presented to the referee. Moreover, the authority cited above (pp. 17-19, *ante*), suggests otherwise. (*Marathon Nat. Bank v. Superior Court, supra,* 19 Cal.App.4th 1256, 1261; *Rockwell Internat. Corp. v. Superior Court, supra,* 26 Cal.App.4th at pp. 1269-1270.)

and deciding dispositive motions is not one of the special references authorized by section 639 which the court may make without consent," the appellate court reversed. (*Jovine*, *supra*, 64 Cal.App.4th at p. 1523.)

*Jovine* is thus distinguishable. First, unlike *Jovine*, the trial court here did not wrongfully empower the referee to consider and decide determinative motions without the parties' consent and in violation of section 639, the purported basis of the reference. Rather, the court entered a valid order pursuant to section 639, subdivision (a), in accordance with the parties' written stipulation, appointing the referee to consider the limited issue of compensation. Second, after the referee submitted his final report recommending no additional compensation for petitioners, the trial court did not, as in *Jovine*, simply adopt the report as its own; rather, as set forth above, the court conducted the requisite independent judicial review and thereafter concluded the referee's recommendations were correct. Thus, where, as in this case, "the trial court's order[] demonstrate[s] a considered and careful review not only of the referee's report but also of the transcript of the proceedings held before the referee, and of the stacks of objections, responses, replies and other papers filed after the referee's report was submitted, we are able to say with confidence that the trial court did not abdicate its judicial responsibilities. [Citation.]"[17] (*Marathon Nat. Bank v. Superior Court, supra*, 19 Cal.App.4th at p. 1261.)

_____

[17] We briefly address petitioners' argument that the referee or cotrustees violated the rules for transporting exhibits admitted at the reference to the trial court. Specifically, rule 2.400(c)(2) states that where, as here, "proceedings are conducted by a . . . referee outside of court facilities, the . . . referee must keep all exhibits and deliver them, properly marked, to the clerk at the conclusion of the proceedings, unless the parties file, and the court approves, a written stipulation providing for a different disposition of the exhibits." (See also rule 3.930.) According to petitioners, the fee petition order is subject to reversal because the trial court did not have in its possession all the exhibits admitted during the reference proceedings. However, as the cotrustees note, petitioners never alerted the trial court or referee to the fact that the requirements of rule 2.400 had not been met before judgment was entered. Had they done so, the alleged error could easily have been rectified. At this late juncture, however, we conclude petitioners have forfeited the right to rely on rule 2.400(c)(2) as a basis for reversing the order. And even if they had not forfeited this right, we would conclude petitioners had demonstrated no prejudice given their failure to identify a single exhibit that would have resulted in a different outcome.

## VI. The Cross-Appeal.

Finally, the cotrustees challenge the fee petition order on one ground – that the trial court erred by ordering the trust to pay 100 percent of the referee's $99,640.21 fee for his work on this matter. In so ordering, the trial court declined, without explanation, to adopt the referee's recommendation that petitioners collectively pay 40 percent of the fee and the trust, as the prevailing party, pay the remaining 60 percent. The relevant law is not in dispute.

"Under section 645.1, the trial court may, at the time the referee is appointed, order the parties to pay the referee's fees 'in any manner determined by the court to be fair and reasonable, including an apportionment of the fees among the parties.' " (*Marathon National Bank v. Superior Court, supra,* 19 Cal.App.4th at p. 1261.) "It is . . . the responsibility of the court, not the referee, to determine what manner of payment is 'fair and reasonable' to the parties. (§ 645.1; [citation].) In performing its judicial function, the court must avoid even the appearance of unfairness: '[t]he justice system not only must be fair to all litigants; it must also appear to be so.' [Citation.]" (*Taggares v. Superior Court* (1998) 62 Cal.App.4th 94, 105.) On appeal, a trial court's allocation of fees is reviewed for abuse of discretion. (*Winston Square Homeowners' Assn v. Centex West Inc.* (1989) 213 Cal.App.3d 282, 293.)

Here, the cotrustees do not contend the referee's fee was unreasonable in amount or unnecessary to the litigation. They contend the fee should have been shared equitably by the parties and not imposed entirely on the trust.

The order of reference provided that the referee would in the first instance recommend how to allocate his fee among the parties. Consistent with this order, following the reference proceedings, the referee recommended the trust, as the prevailing party, pay 60 percent of his fee, and petitioners pay the remaining 40 percent. In making this recommendation, the referee stated his belief that the fee petition, like most fee petitions, could have been resolved much more efficiently and without the need for holding over five days of hearings. With respect to what he deemed this unnecessary expenditure of resources, the referee noted that, while petitioners "presented their side of the case in

relatively short order," the opponents, including the cotrustees, "persistently pressed for the extended proceedings."

Subsequently, after independently reviewing the referee's report, the trial court altered the referee's recommendation that the trust pay 60 percent of the fee by increasing its payment obligation to 100 percent. As stated above, the trial court provided no explanation. While we agree it would have been preferable for the trial court to expressly state its reason for changing the fee allocation, we cannot conclude on this record an abuse of discretion occurred. Simply put, the trial court could, in reaching a fair and reasonable apportionment of the fee, rely on the referee's finding that the prevailing parties, by their own conduct, significantly and unnecessarily increased the time and resources required to hear petitioners' petition. (See *Taggares v. Superior Court, supra,* 62 Cal.App.4th at p. 105.) Unlike this court, the referee and trial court were present to hear the parties' arguments and observe their conduct during the course of these proceedings. (*Baker-Hoey v. Lockheed Martin Corp.* (2003) 111 Cal.App.4th 592, 605.) Under these circumstances, we decline to overrule the lower court decision. The order that the trust bear 100 percent of the referee's fee stands.

## DISPOSITION

The order is affirmed.  The parties will bear their own costs on appeal.

 

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.