Filed 10/15/20  In re K.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re K.B., a Minor. | |
| | D077068 |
| M.D., | |
| Petitioner and Appellant, | (Super. Ct. No. A62042) |
| v. | |
| J.B., | |
| Petitioner and Respondent. | |


APPEAL from an order of the Superior Court of San Diego County, Edlene C. McKenzie, Judge.  Affirmed.

Judith Klein for Plaintiff and Appellant M.D.

Julie E. Braden, under appointment by the Court of Appeal, for the Minor and Respondent.

No appearance by Respondent J.B.


M.D., the biological father (Father) of K.B. appeals from an order denying his motion to vacate the adoption of K.B. by the adoptive mother J.B.

In its statement of decision, the trial court found that Father was unable to establish his parental rights before they were terminated because he relied on a misrepresentation by the birth mother T.C. that she had a miscarriage. The court found that although J.B. knew Father's identity during the pregnancy and had a moral obligation to disclose it to the court, she did not have "a legal responsibility" to do so. The court denied Father's motion on the ground it would not be in K.B.'s best interests to set aside the adoption. Father contends the court abused its discretion in finding it was in K.B.'s best interests to remain with an adoptive parent who committed fraud and that the court erred in denying him relief after finding that extrinsic fraud prevented him from establishing a parental relationship with K.B. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*K.B.'s birth and adoption*

T.C. gave birth to K.B. on June 8, 2016, which resulted in a referral to the San Diego County Health and Human Services Agency (the Agency) due to T.C.'s history of child abuse and neglect. The next day T.C. told an Agency social worker that she was not sure of the father's identity and that she had met him only one time. She said that when she conceived K.B., she was having "some good times" with her friend Veronica and Veronica's friend in a hotel in Imperial Beach, but she did not remember Veronica's last name or her friend's name. She thought K.B.'s father had black hair and black skin and spoke only English, and that his first name started with the letter M.

T.C. voluntarily placed K.B. with J.B., who had adopted her two older children, because she wanted to keep the three children together. She wanted to relinquish her rights to K.B., and after she completed a competency evaluation, it was determined that she could proceed with the

2

adoption process. She was scheduled to meet with an adoption's social worker on September 7, 2016, to sign relinquishment papers, but was found deceased by her caregiver on September 4, 2016.

The Agency filed a dependency petition on September 7, 2016, alleging that K.B. was left with no provision for support. The court declared K.B. a dependent of the court on September 29 and set a section hearing under Welfare and Institutions Code section 366.26 for January 25, 2017, to determine K.B.'s permanent plan. The court ordered the Agency to make its "best efforts to identify father's identity by contacting family, non-relative extended family members and/or friends." (Capitalization omitted.)

On November 21, 2017, the Agency filed a declaration of due diligence, in which it noted the dependency petition had been amended to update the father's identity from unknown to "first name initial 'M' AKA M Unknown." Given the minimal information about the father's identity that T.C. was able to provide, the Agency was "unable to determine the identity of [K.B.'s] father, 'M' AKA M Unknown." Without any identifying information such as a full name, date of birth, or social security number, the Agency was unable to conduct a search for the father. The Agency further noted that the identities of K.B.'s paternal grandparents were unknown.

Based on the Agency's declaration, the court found there had been due diligence in trying to locate the unknown father and ordered that "notice to 'M' AKA M Unknown, shall be dispensed with as all attempts made to ascertain the identity of the alleged father have been unsuccessful and no further attempts including publication would lead to actual notice to the alleged father."

On January 25, 2017, the juvenile court selected adoption as K.B.'s permanent plan, terminated parental rights, and declared K.B. "free from the

3

custody and control of [her] father M, plus all AKA's . . . ." On July 20, 2017, J.B. filed a form "Adoption Request" seeking to adopt K.B. The request noted that the court had ended parental rights of alleged fathers and that the mother T.C. had died. The Agency filed a joinder in J.B.'s "petition" to adopt K.B., requesting that the petition be granted. The Agency also filed a form confirming its receipt of documents verifying that the court had terminated parental rights and that the mother was deceased. The Agency reiterated those facts in a report to the court in which it approved of J.B. as an adoptive parent and recommended the court grant the petition for adoption.

On September 1, 2017, J.B. signed and filed a form adoption agreement. The court entered an adoption order finalizing J.B.'s adoption of K.B. and terminated dependency jurisdiction

*Father's relationship with T.C. and knowledge of K.B.*

At the evidentiary hearing on his motion to vacate the adoption, Father testified that he met T.C. around May of 2015 at a 7-Eleven store.[1] They exchanged cell phone numbers and began a dating relationship that ended around October or November 2015. They had sex one time during the relationship. The relationship ended because it was difficult for Father to keep contact with T.C., who was transient and did not have a stable home.

Around November 2015 T.C. called Father and told him that she was pregnant and that she was sure it was his child. Father was excited and told T.C. that he loved kids and had no problem taking care of his child, but he needed to have a paternity test as soon as possible. When he said that, T.C.

---

[1]    Father later testified that he started seeing T.C. in January or February of 2015 and that his earlier testimony that they met in May of 2015 was incorrect.

4

"got mad" and someone in the background started talking to her.[2] He heard T.C. refer to the other person by J.B.'s first name. He became upset when he heard the other person say things like, "I told you he, wasn't nothing. I told you he didn't want this baby." Father said to T.C., "If this is my baby, this has nothing to do with that person. . . .What me and you have, did, has to do with me and you, not this other person. Can you please call me when it's just me and you?"

After that telephone conversation, Father tried to find T.C. and repeatedly called her cell phone number, but was unable to contact her. Two or three weeks after she told Father she was pregnant, Father received a telephone call from T.C. while riding in a car with his girlfriend T.B. T.C. told Father that she had been in a car accident and had a miscarriage. Father again heard another person speaking in the background and heard T.C. address the other person by J.B.'s first name and say to the other person, "[J.B.], can you please stop talking? Let me talk to him." Father testified that he said to T.C., "You had a miscarriage, this is something we need to talk about one-on-one, but every time you call me you got somebody else in the background. This has nothing to do with nobody else but me and you. Can you please call me when you got nobody else in the background." T.C. never called Father again and when he called her back with the last number he had for her, the number was disconnected.

The last time Father saw T.C. was in July of 2016, after K.B.'s birth. T.C. called Father and said she wanted to meet with him and talk because she had not seen him in a while. They met downtown but T.C. said nothing

_____

[2] The reporter's transcript is printed in all capital letters. We have modified all quotations from that transcript to reflect conventional capitalization.

during the meeting. She appeared to be confused and just looked at the ground with a blank stare. Father asked her if she was okay, if anything was wrong, if she had something to tell him, if she needed help, but T.C. did not respond. Finally, Father said he had to go and asked T.C. for a hug. T.C. hugged Father and he told her that he had to go to work and to let him know if she needed anything. Father did not ask T.C. about the baby because she had told him that she had a miscarriage.

Father testified that in August or September of 2017, he was working at a food concession at Petco Park before a baseball game when J.B. approached him and asked if he would take a photograph of her and her friend who was with her. Father took a few photos of J.B. and her friend with J.B.'s phone, and when he handed the phone back to J.B., she said, "Hey, is your name [M.D.]?" Father said, "Yes, it is." J.B. said, "I'm [T.C.'s] friend. I have her kids." She told Father she had heard about him and wanted to let him know that T.C. had a seizure and passed away earlier that year.

J.B. asked Father if he was T.C.'s boyfriend. Father said, "No, I wasn't her boyfriend, but we were cool. We were cool. We definitely dated. We were cool." J.B. responded, "Okay. I want to let you know I'm the person who has her kids." J.B. then showed Father a picture of K.B.'s two older half-siblings. Father remembered that T.C. had shown him the same picture when she told him about her children. Father asked J.B. if she needed help with anything. She replied, "No we're good. I just wanted to let you know that [T.C.] passed away." J.B. did not mention that T.C. gave birth to a child in 2016 or that there might be a child that he fathered.

J.B. visited Father at his workplace a second time in April 2018. Father was mopping up a spilled drink when J.B. tapped him on the shoulder

and said, "[T.C.] only told you it was a miscarriage because she didn't want you to take the baby." J.B. showed Father a photograph of K.B. and said, "I think this is your baby, I need you to take a DNA test." Father was shocked. He and J.B. exchanged phone numbers and Father agreed to take a paternity test.

After J.B. left, Father was too upset to continue working so he went home and started exchanging text messages with J.B. Father testified that in his text messages he "started letting [J.B.] know 'this is crazy. Why didn't you tell me this a year ago? You came here a year ago, this is not cool. You could have told me this a year ago.. . . . This [is] not fair. This don't make no sense."

J.B. testified that in December 2015, T.C. expressed to J.B. that she wanted J.B. to adopt K.B. J.B. knew that T.C. had told the "potential father" that she had a miscarriage. T.C. was not sure who the father was and thought there were three possible fathers. She said the name of one started with "M" and another was her roommate. Regarding Father's testimony that J.B. was present during T.C.'s phone calls to him, J.B. denied that she had ever been on a three-way call with T.C., or was in any way present during those calls.

J.B. went to see Father the first time in 2017 because T.C. had said "a guy that started with M could have been [K.B.'s] dad" and that he worked at Qualcomm Stadium at a particular kind of food concession. J.B. went to Qualcomm but there was no such concession there, so when she attended a game at Petco Park, she looked there. When she asked Father what his name was, he said that people call him "[M.D.]" Her purpose in meeting Father was to find out whether he knew T.C. and "could be the potential father." She testified that she asked him if he had "ever hooked up with

7

[T.C.]" He answered, "No. She was only my homegirl[,]" so she "left it at that." She did not ask him anymore questions because she did not think that "he was going to tell [her] anything different than 'No.' " She later testified that she asked Father whether he had "messed with" T.C., and he answered, "No, we were only friends." On cross-examination she testified that she did not tell the court that Father (the person named "M") could be K.B.'s father and did not tell Father in 2017 about K.B. because Father told her he had not slept with T.C.

J.B. testified that when she met Father the second time in 2018, she asked him, "Are you sure you never hooked up with [T.C.] because there is a child involved?" Father responded, "I may have slept with her once or twice." J.B. and Father exchanged phone numbers, but J.B. did not remember discussing "anything about DNA." In the text exchanges that ensued, they discussed DNA testing, but it did not happen because Father became rude and disrespectful to J.B. in his text messages. She stopped texting him and blocked his number because "he was cussing at [her] through text."

*Father's motion to vacate the adoption*

On April 20, 2018, Father filed correspondence with the court in which he recounted the facts about his relationship with T.C., the phone calls from T.C. in which she told him about her pregnancy and miscarriage, J.B.'s two visits to his workplace, and their agreement during the second visit that he would get a paternity test. He stated, "But when I try to contact [J.B.] she won't give me any information on the child and she won't set up a time and place to test, she tells me not to worry about [it] because she adopted the girl, now I can't get in contact with her. I would like for this case to be reopened based on the fact that I had no idea about the child and both part[ies] knew that I was a potential father. I would like to take a paternity test ASAP[.]"

On April 27, 2018, Father filed a declaration stating that he believed there was "an adoption in process" for a child that might be his child and that he was contesting the adoption.

On May 10, 2018, counsel for the superior court sent Father a letter informing him that the adoption of K.B. was finalized on September 1, 2017, and that the court could not consider his request unless he filed a formal motion and gave notice of the motion to everyone involved in the case. Court counsel recommended that Father talk to an attorney who is familiar with adoption law.

On May 16, 2018, Father filed a petition to view records in K.B.'s adoption case. About a month later he filed a second petition to view records with assistance of counsel. In his declaration in support of the petition, Father set forth the relevant facts and stated that based on the dates of his relationship with T.C. and K.B.'s date of birth, there was a very good possibility he was K.B.'s biological father. He suspected fraud may have been committed on the court in that his "status as a potential biological father may have never been disclosed during the proceedings." He contended that "[J.B.] was aware of [his] status as [a] potential biological father of [K.B.] prior to the finalization of the adoption." He requested access to the adoption records to confirm that he was not mentioned as a potential biological father and, if he was mentioned, to "determine if there was an error in the service of the notice of the proceedings upon me or there was some other reason that [he] was not made aware of the proceedings." The record indicates that the court granted Father's petition to view records and that he received the records of the dependency proceedings leading to the adoption on August 27, 2018.

On November 13, 2018, Father filed his motion to vacate the adoption of K.B. on the ground his rights as an alleged father were terminated due to

9

extrinsic fraud. In his supporting declaration, Father averred that J.B.'s knowledge of his status as a potential father and ability to find him were "clear proof that [T.C.] also knew [he] was the potential father of [K.B.]" He asserted that both J.B. and T.C. knew of his status as a potential father before the court terminated the parental rights of alleged fathers in the dependency case and the adoption was finalized in the present case, yet neither informed the court of Father's identity. Father contended that J.B. continued T.C.'s fraud in the dependency case into the adoption case. Father "did not learn the extent and true nature of this fraud until August 27, 2018 when [he] returned from a family vacation and [his] attorney shared the documents released . . . by the Court in [the dependency case].

The court set Father's motion for a special hearing on December 27, 2018, and at the December hearing continued the matter to January 11, 2019. On January 11, the court appointed counsel to represent K.B. and continued the matter to February 22, 2019. On February 22, the court ordered a paternity test for Father and set a special hearing for April 26, 2019. On April 26, the court appointed counsel for J.B. and acknowledged that the results of Father's paternity test indicated Father was K.B's biological father. The court set the matter for trial on July 26, 2019. On July 26, the matter had to be continued again, over Father's objection, because the judge on the case was unavailable due to unanticipated circumstances. The court set the trial for October 9 and 10, 2019.

At the beginning of the hearing on October 9, 2018, the court considered oral motions by J.B.'s counsel and minor's counsel to "dismiss" (i.e., deny) Father's motion to vacate the adoption on the ground the motion was untimely under Family Code section 9102, subdivision (b), which provides that "an action or proceeding of any kind to vacate, set aside, or

10

nullify an order of adoption, based on fraud, shall be commenced within three years after entry of the order, or within 90 days of discovery of the fraud, whichever is earlier."  Counsel for K.B. and J.B. argued that Father filed his motion to vacate the adoption more than 90 days after he was aware of the alleged fraud.[3]

The court denied the motions, ruling that Father's motion to vacate the adoption filed on November 13, 2018, was timely under the statute because he filed it within 90 days of August 27, 2018, the date he obtained the court records that revealed the facts that supported his fraud claim–in particular, the fact that the court was not given his identity in the prior proceedings. The court stated, "There's a difference between finding out that you're the father or possibly the father and the actual facts that might substantiate the claim of fraud.  They're two different things."

The court then heard testimony from a number of witnesses in addition to Father and J.B., including T.C.'s friend L.M., who let T.C. stay with her for a couple of weeks during the period that T.C. was dating Father.  L.M. had met Father because he had been at her house a couple times.  T.C. told L.M. that she was pregnant and that the child might be Father's.  Father contacted L.M. when he was looking for T.C. after she became pregnant.  The court also heard testimony from Father's current girlfriend, who had been dating him since October 2017, and from J.B.'s friend who was with J.B. the first time she met Father at his workplace in 2017.

---

[3]     Although the record does not reflect that J.B. and K.B. filed written motions, in their written opposition to Father's motion to vacate the adoption, both J.B. and K.B. argued that the court lacked jurisdiction to hear Father's motion to vacate the adoption because it was untimely under Family Code section 9102, subdivision (b).

In addition to the testimony noted above, J.B. testified that she had a job and a close relationship with K.B., who was in the same preschool that her (K.B.'s) older half-siblings attended. J.B. took K.B. to the zoo, Sea World, Disneyland, the park, and medical appointments. K.B. was diagnosed with autism and was receiving speech therapy twice a week, and was involved 12 hours a week in applied behavior analysis, a therapy that teaches autistic children to function in a large group and in the community. J.B. testified that K.B. got along well with her older sisters, who were ages five and eight.

After J.B. testified, the court asked the parties to submit their closing arguments in writing and continued the matter to October 25, 2019, for its statement of decision. Father, K.B., and J.B. filed post-hearing briefs. On October 21, the court took the October 25 hearing off calendar because it required more time to render its decision. The court informed the parties that it would mail its statement of decision to them.

On November 14, 2019, the court filed its statement of decision denying Father's motion to vacate the adoption. The court found that T.C. committed extrinsic fraud that prevented Father from establishing parental rights before the court terminated them. The court stated: "While [T.C.'s] medical and psychosocial history is of great concern to the court, she very specifically told [Father] that he was the father and she lied when she told him [she] suffered a miscarriage. When [T.C.] asked to see [Father] in the summer of 2016, she had an opportunity to tell him that he was the father of her child born the month before and chose not to. [Father] relied upon [T.C.'s] misrepresentation that she had a miscarriage as evidenced by his not taking any further action regarding paternity until it became known to him that [K.B.] had in fact been born and he could be the father. Consequently,

12

[Father] was not able to establish his parental rights prior to his rights being terminated."

The court essentially found that J.B. was complicit in T.C.'s fraud and expressly found that she had a *moral* obligation to disclose her knowledge of Father in the dependency proceedings but not a *legal* obligation to do so. The court believed "[J.B.] knew the identity of [Father] during [T.C.'s] pregnancy." The court stated: "[L.M.], [T.C.'s] old high school friend with who[m T.C.] stayed for a period of time while she dated [Father], was clear that [T.C.] knew [Father] was the father of her unborn baby. It is reasonable to infer now, given what transpired later, that [T.C.] had been discussing with [J.B.] having her care for her baby when she was born. The court believes that [J.B.] was present during the telephone call concerning the miscarriage based upon [Father's] credible statements that he heard [T.C.] interact with a person referred to [as J.B.'s first name] during that fateful call." However, the court concluded that "[n]otwithstanding [J.B.'s] knowledge of [Father's] identity during [T.C's] pregnancy and the moral obligation she had to disclose his identity, there is no authority presented showing [J.B.] had a legal responsibility to conduct a search or report to the court concerning any information she possessed regarding [K.B.'s] father's biology."

The court addressed K.B.'s best interests as follows: "It is tragic that the parties were not able to work out an arrangement that would allow [K.B.] the ability to know her biological father and his family and still preserve the integrity of the stable placement she enjoys. [K.B.] has a clear interest in knowing who she is and how she came to be in her family constellation.

"[K.B.] is three years old and has been living in [J.B.'s] home since birth. [J.B.] is the only mother [K.B.] has ever known. Because [K.B.] is on the autism spectrum, she requires extra time and attention including speech

13

therapy and Applied Behavior Analysis. [K.B.] is involved in lots of activities and medical appointments. She has resided with two older half-siblings since birth and from all accounts is close to them.

"If the court were to set aside the adoption, [K.B.] would have no legal parent. The court would be required to contact [the Agency] to do an investigation for purposes of filing a petition for protection in the juvenile court under Welfare and Institutions Code section 300. If the agency were to file a petition under W&I 300 (g) (no parent or guardian), the agency would be required to assess [J.B.] under the relatively new 'RFA' criteria.[4] There are no guarantees that [K.B.] would be permitted to remain in her current home. In the meantime, since [Father's] rights have already been terminated in the prior dependency action, a petition would be required to attempt to set that finding and order aside. There is no guarantee that this attempt would be successful. If the court did set aside the order terminating his parental rights, the court would be required to assess whether it would be in [K.B.'s] best interest to afford reunification (or in this case unification) since [Father] is only a biological father. Again, there are no guarantees that [Father] would be successful. In the meantime, [K.B.] would be a dependent of the juvenile court while all of these issues are being resolved legally. It is unknown how long this process could take. Meanwhile, [K.B.'s] future would be up for grabs. It would clearly not be in [K.B.'s] best interests to be in legal

---

4    The court's "RFA" reference presumably is to the Resource Family Approval Program. "Implemented statewide on January 1, 2017, the Resource Family Approval Program (RFA) provides a unified approval process to replace the multiple processes to approve foster care homes, relatives and nonrelative extended family members, and adoptive homes for the placement of dependent children." (*In re Charlotte C.* (2019) 33 Cal.App.5th 404, 408.)

limbo and to have her current placement destabilized for an undetermined period."

The court's statement of decision concluded with the following ruling: "The court finds [Father's] action was timely. The court finds that [T.C.] lied to [Father] about miscarrying his child which ultimately prevented him from bringing an action to establish paternity. The court finds that while [J.B.] knew of the identity of [Father] at the time of [T.C.'s] pregnancy, she was under no legal obligation to disclose his identity. The court does not find that it would be in [K.B.'s] best interest to set aside the adoption. [Father's] request to do so is DENIED."

## DISCUSSION

Father contends the court abused its discretion in finding that it was in K.B.'s best interests to remain with an adoptive parent who committed fraud. He further contends the court erred in denying him relief after finding that extrinsic fraud prevented him from establishing a parental relationship with K.B.

"Adoption proceedings involve a wide discretion on the part of the trial judge, and [the court's] decision upon the facts presented . . . will not be set aside unless a clear abuse of discretion is shown." (*Adoption of Smith* (1969) 270 Cal.App.2d 605, 609.) On appeal from a trial court's adoption decision, we will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*Ibid.; In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) In applying the abuse of discretion standard of review, we consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts most favorably to the trial court's decision. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067, superseded by statute on another ground as noted in

15

*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032.) We will reverse a trial court's discretionary decision only if, after considering the evidence most favorably to support that decision, we conclude no judge could have reasonably made that decision. (*Ibid.*)

Father does not challenge the court's best interest analysis per se, other than to argue that in weighing K.B.s best interests, the court should have considered whether J.B.'s participation in the extrinsic fraud that prevented him from participating in the dependency and adoption proceedings rendered her unfit to parent such that it would not be in K.B.'s best interests to remain in her care. Contrary to what Father suggests, the court's statement of decision reflects that it did consider J.B.'s role in the extrinsic fraud. As noted, the court stated its belief that J.B. knew Father's identity during T.C.'s pregnancy and had a "moral obligation . . . to disclose his identity" even though she had no "legal responsibility" to do so. Although the court did not expressly refer back to J.B.'s involvement in the extrinsic fraud in its best interests analysis, the court presumably took it into account in considering whether it would be in K.B.'s best interests to vacate the adoption, and obviously concluded that the benefits of continuing K.B.'s stable home life with J.B. and her sisters outweighed any harm she might theoretically suffer as a result of J.B.'s breach of her moral obligation to disclose Father's identity to the court during the dependency and adoption proceedings.

Aside from the court's alleged failure to consider J.B.'s fraud in its best interests analysis, Father's essential claim is that because he established, and the court found, that he was prevented by extrinsic fraud from being heard in the dependency and adoption proceedings and there was no claim or finding that he was unfit to parent, the court should have vacated the

16

adoption order notwithstanding the benefit to K.B. in maintaining the adoption – i.e., the court erred in ruling that K.B.'s best interests trumped his due process right as a biological parent to receive notice and an opportunity to be heard in the adoption proceedings.

Thus, Father presents the following issue: Where the trial court has found that a child's biological father was prevented by extrinsic fraud from asserting his parental rights and contesting the child's adoption and there is no finding that the father is unfit to parent, does the court nevertheless have discretion to deny the father's timely petition to vacate the adoption on the ground that it would not be in the child's best interests to vacate the adoption? We conclude the court is required to consider the child's best interests in that circumstance notwithstanding its finding of extrinsic fraud and, depending on the facts, may properly exercise its discretion to deny a father's request to vacate an adoption based on the child's best interests.

Family Code section 9102 subdivision (c), provides: "In any action to set aside an order of adoption pursuant to this section or Section 9100, the court shall first determine whether the facts presented are legally sufficient to set aside the order of adoption. If the facts are not legally sufficient, the petition shall be denied. *If the facts are legally sufficient, the court's final ruling on the matter shall take into consideration the best interest of the child*, in conjunction with all other factors required by law." (Italics added.)

Thus, Family Code section 9102, subdivision (c), *requires* the court to consider whether vacating an adoption order would be in the child's best interests even if the facts supporting a petition to set aside the adoption are legally sufficient. The statute does not direct the court to consider whether a petitioning parent is fit to parent or whether granting the petition would be detrimental to the child; it only specifically directs the court to consider the

17

child's best interest. By requiring the court to consider the child's best interest "in conjunction with all other factors required by law" when presented with legally sufficient facts to grant a petition to vacate an adoption, section 9102, subdivision (c), necessarily gives the court discretion in an appropriate case to deny a petition on the ground that vacating the adoption would not be in the child's best interests, notwithstanding the legally sufficient facts to grant the petition.[5] Here, the facts supporting the court's finding of extrinsic fraud were legally sufficient to support an order granting Father's motion to vacate the adoption, but the court lacked authority to vacate the adoption based on those facts without considering whether it would be in K.B.'s best interests to do so. To conclude that the court was automatically required to set aside the adoption based on its finding of extrinsic fraud would contravene the requirement under section

---

[5]    Consideration of the child's best interests under Family Code section 9102, subdivision (c), is consistent with Family Code section 7664. Subdivision (b) of section 7664 provides that "[i]f the biological father or a man claiming to be the biological father claims parental rights, the court shall determine biological parentage. The court shall then determine if it is in the best interest of the child that the biological father retain parental rights, or that an adoption of the child be allowed to proceed." Subdivision (c), provides: "If the court finds that it is in the best interest of the child that the biological father should be allowed to retain parental rights, the court shall order that the biological father's consent is necessary for an adoption. If the court finds that the man claiming parental rights is not the biological father, or that if the man is the biological father it is in the child's best interest that an adoption be allowed to proceed, the court shall order that the consent of that man is not required for an adoption. This finding terminates all parental rights and responsibilities with respect to the child." Thus, whether a biological father challenges an adoption before it is final or presents legally sufficient facts to vacate the adoption after it is final, the court's principal consideration in resolving the matter is the child's best interest.

18

9102, subdivision (c), that "its final ruling shall take into consideration the best interest of the child . . . ."

In addition to Family Code section 9102, subdivision (c), California case law supports the principle that in considering whether to vacate an adoption, the overriding concern is the child's best interests. In *Adoption of Jason R.* (1979) 88 Cal.App.3d 11, 17, the Court of Appeal stated: " 'The welfare of the child is the paramount consideration in all courts of record in proceedings involving the custody of children; and this principle will be found reiterated in most of the cases involving proceedings for annulment or vacation of adoption decrees. In other words, if an annulment clearly appears to be in the best interest of the welfare of the child, this alone would constitute proper grounds for annulment at the instance of either the natural or the foster parents.' " The corollary to that principle is that if denying a petition to vacate an adoption clearly appears to be in the child's best interests, that alone may be proper grounds for denying the petition and preserving the adoption. As another court stated: " 'It is the cardinal rule of adoption proceedings that the court consider what is for the best interests of the child. [Citation.]' [Citation.] We can never ignore the child's best interests, 'no matter what preliminary action its parent or parents may have taken.' [Citation.] Indeed, the child's welfare is '*the controlling force* in directing its custody . . . .' " (*Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1257.)

In *San Diego County Dept. of Pub. Welfare v. Superior Court* (1972) 7 Cal.3d 1, the California Supreme Court noted that "[i]n an adoption . . . proceeding, however, the question of clean hands is largely subordinated to the court's primary concern which is to determine what is in the best interest of the child." (*Id.* at p. 9.) The Supreme Court further noted that "the consent of the natural parents, except in those situations excepted

by statute, is a jurisdictional prerequisite to an adoption *with the caveat that such consent requirements are no longer to be construed strictly in favor of the rights of the natural parent.* As we have pointed out, such requirements are to be liberally construed in order to effect the object of the adoption statutes in promoting the ' "welfare of children, bereft of the benefits of the home and care, of their real parents . . . ." ' " (*Ibid.* at. p. 16, italics added.) Thus, California case law further supports the court's discretion in this case to deny Father's motion to vacate the adoption based on its consideration of K.B.'s best interests.

Father relies on *Adoption of Kelsey S.* (1992), 1 Cal.4th 816 (*Kelsey S.*) and *In re Baby Boy V.* (2006) 140 Cal.App.4th 1108 (*Baby Boy V.*), which support the proposition that "[w]hen an unwed father learns of a pregnancy and 'promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother.' " (*Baby Boy V., supra,* at p. 1117, quoting *Kelsey S., supra,* at p. 849.) The *Baby Boy V.* court concluded that "[b]ecause there was nothing in the record to suggest that [the father] is unfit as a parent, he was entitled to presumed father status and, absent the presentation of evidence of unfitness on remand, he is entitled to reunification services and visitation–provided that [he] establishes on remand that, as represented, he in fact came forward promptly on learning of

20

the baby's existence and otherwise satisfied the requirements of *Adoption of Kelsey S. . . . .*" (*Baby Boy V., supra,* at p. 1118.)[6]

The key distinction between *Baby Boy V., Kelsey S.* and *Baby Girl M.* and the present case is that Father here did not learn of the adoption and come forward to claim his parental rights until well after the adoption was final. In *Kelsey S.* the father asserted his desire to parent the child immediately upon learning of the pregnancy, and in *Baby Boy V.* and *Baby Girl M.*, the fathers came forward as soon as they learned of the child's existence, which was before the court terminated parental rights and ordered adoption as the child's permanent plan. The court here was faced with a challenge to an adoption by a father who first asserted his desire to parent the adopted child a substantial time after the adoption was final.

Because Father petitioned to set aside an adoption that was final, his petition was governed by Family Code section 9102, subdivision (c), which, as we discussed, expressly requires the court to consider the child's best interest in ruling on a petition to vacate an adoption. In light of the requirement under section 9102 that the court consider the child's best interests in ruling on a petition to vacate an adoption and the case law supporting the principle that the overriding consideration in adoption proceedings is the child's best interests, the court did not abuse its discretion in denying Father's petition based on K.B.'s best interests even though it found that he was excluded from the dependency proceedings as a result of extrinsic fraud.

---

6     Father also cites *In re Baby Girl M.* (1984) 37 Cal.3d 65, 75 (*Baby Girl M.*), in which the California Supreme Court held the trial court erred by applying the best interests of the child standard without first determining whether granting custody to the natural father would be detrimental; however, as the Supreme Court noted in *Kelsey S.*, that holding was abrogated by a statutory amendment. (*Kelsey S., supra,* 1 Cal.4th at pp. 839-840.)

The court's exercise of discretion to deny Father's motion to vacate the adoption is also supported by the likelihood that granting the motion would ultimately result in the adoption's being reinstated anyway based on K.B.'s best interests. If the court were to set aside the adoption and vacate the order terminating parental rights, under Family Code section 9101 it would then decide who would have custody of K.B. pending further proceedings. Family Code section 9101, subdivision (a), provides: "If an order of adoption is set aside as provided in Section 9100, the court making the order shall direct the district attorney, the county counsel, or the county welfare department to take appropriate action under the Welfare and Institutions Code. *The court may also make any order relative to the care, custody, or confinement of the child pending the proceeding the court sees fit.*" (Italics added.) The court would likely order that K.B. remain in J.B.'s custody pending future proceedings because J.B.'s home is a stable placement and it would be an abuse of discretion to remove K.B. from the only home she has ever known absent a finding that it would be detrimental for her to remain there.[7]

The status of J.B.'s petition to adopt K.B. would revert to pending with Father's participation in the proceedings as a biological father claiming parental rights. Under Family Code section 7664, the court would be required to determine whether it is in K.B.'s best interest for Father to retain parental rights or whether it is in her best interests that the adoption be

---

[7] In his opening brief, Father submits that the court should have set aside the adoption and "fashioned court orders to allow [K.B.] to remain with [J.B.] while [Father's] fitness to parent was evaluated."

22

allowed to proceed.  (Fam. Code § 7664, subds. (b) & (c).)[8]  Father would have the burden of showing it would be in K.B.'s best interests for him to retain parental rights and the adoption not to proceed.  (*Adoption of Emilio G.* (2015) 235 Cal.App.4th 1133, 1151.)  For reasons stated in its order denying Father's motion to vacate the adoption, the court would likely find it in K.B.'s best interests to allow the adoption to proceed, and the case would be in its current posture – i.e., K.B. would be adopted by J.B. and Father's parental rights would be terminated.

Thus, reversing the order denying the motion to vacate the adoption would likely accomplish little other than the court's and parties' expenditure of substantial time and resources.  We are not saying that to the extent the court erred in denying Father's motion to vacate the adoption the error was harmless; we simply observe that the court's exercise of discretion to deny the motion to vacate the adoption is further supported by the fact that the likely end result of vacating the adoption would be to allow it to proceed to finality a second time based on consideration of K.B.'s best interests.

We obviously do not condone the type of extrinsic fraud that occurred in this case and we sympathize with Father's loss of the right to challenge the adoption before it became final and before a substantial period of time passed after it became final.  However, we cannot conclude the court abused its discretion in deciding it was not in K.B.'s best interests to set aside the adoption.  As the court noted in its statement of decision, K.B. has been living

---

[8]    Similarly, if the case were to proceed as a dependency case, Father, as a biological but not presumed father, would have to show that it is in K.B.'s best interests for him to be provided reunification services.  (Welf. & Inst. Code, § 361.5, subd. (a) ["[T]he juvenile court may order [reunification] services for the child and the biological father, if the court determines that the services will benefit the child."]; *In re Elijah V.* (2005) 127 Cal.App.4th 576, 589.)

in J.B.'s home since her birth in 2016 and J.B. is the only parent she has ever known.  K.B. lives with her two older half-siblings with whom she has a close relationship and is involved in many activities.  She is on the autism spectrum and has ongoing therapies and a lot of medical appointments. Given the circumstances of this case, the court did not exceed the limits of legal discretion in denying Father's motion to vacate the adoption on the ground granting the motion would not be in K.B.'s best interests.

## DISPOSITION

The order denying Father's motion to vacate the adoption is affirmed.


McCONNELL, P. J.

WE CONCUR:



BENKE, J.



O'ROURKE, J.


24